FILED

2020 Sep-09  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| STACEY BRIDGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-00529-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CHARITY TESSENER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-01314-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| JESSICA RAINER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-01392-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WHITLEY GOODSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 6:19-cv-01399-LSC |
| vs. | ) | |
| J.C. POE, JR., *et al.*, | Page ) | |
| | ) | |
| Defendants. | ) | |

MEGAN DUNN,                       )
                                  )
    Plaintiff,            )
                                  )          7:19-cv-01571-LSC
    vs.                   )
                                  )
J.C. POE, JR., *et al.*,          )
                                  )
    Defendants.           )

ALLISON MANN,                     )
                                  )
    Plaintiff,            )
                                  )          7:19-cv-01961-LSC
    vs.                   )
                                  )
J.C. POE, JR., *et al.*,          )
                                  )
    Defendants.           )

## MEMORANDUM OF OPINION

Before the Court is Defendant J.C. Poe, Jr.'s ("Poe") Motion to Dismiss Plaintiff's Third Amended Complaint. (Doc. 68 in *Bridges v. Poe et al.*, 7:19-cv-00529-LSC.) Plaintiff Stacey Bridges ("Bridges") brought this suit under 42 U.S.C. § 1983 and the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et seq.* ("TVPA"), for compensatory and punitive damages for injuries she suffered while

confined at the Jasper City Jail (the "Jail"). At the Jail, she alleges she was sexually harassed and raped by jailers Rusty Boyd ("Boyd") and Dennis Buzbee ("Buzbee").[1] She also brings a § 1983 supervisory failure-to-protect claim against Poe, a municipal liability claim against the City of Jasper ("the City"), and a § 1983 conspiracy claim against Poe and others. Lastly, she brings state law claims for assault and battery, negligent hiring, negligent training and supervision, outrage, and violation of ALA. CODE § 14-11-31 (1975), which prohibits municipal employees from engaging in sexual conduct with a person who is in the custody of a municipal jail.

The motion is fully briefed and ripe for decision. For the reasons stated below, the motion is due to be granted in part and denied in part.

## I.    BACKGROUND[2]

On February 5, 2017, Bridges began serving a 90-day sentence at the Jail for a misdemeanor conviction. Compl. ¶ 15, ECF No. 59. According to the complaint, Poe was the City's Chief of Police and the final policymaker for the Jail. *Id.* at ¶ 56.

---

[1]    Bridges has also sued Deborah Johnson ("Johnson"), and Dennis Buzbee in this action. Although the Court has consolidated this suit with several other suits by female inmates of the Jail for pre-trial discovery purposes, the only motion before the Court is Poe's motion to dismiss. This memorandum opinion does not affect Bridges's claims against Johnson and Buzbee, nor does it affect the consolidated suits by other inmates.

[2]    In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). Therefore, the following facts are taken from Bridges's complaint, and the Court makes no ruling on their veracity.

Early in her sentence, Bridges was assigned to work release, and she stayed at another secure facility rather than the Jail. *Id.* at ¶ 16. When the work release ended, Bridges was confined in the Jail and became a trustee. *Id.* at ¶ 17. As a trustee, Bridges was able to leave her cell block to perform work under the supervision of her jailers. *Id.* at ¶ 18. She performed physical labor, such as preparing meals, doing laundry, and cleaning. *Id.* at ¶ 19. Inmates coveted the position of trustee because it eased the conditions of confinement, which would otherwise restrict them to their cells or cell blocks for twenty-three hours per day. *Id.* at ¶ 20.

Both male and female jailers guarded inmates in the Jail. *Id.* at ¶ 24. Male jailers were frequently allowed to guard female inmates without direct supervision and without the presence of female jailers. *Id.* at ¶ 25. Video cameras surveilled various areas of the Jail and streamed their signals on video monitors located in the central office, where jailers monitored inmates. *Id.* at ¶ 27. One area surveilled by video cameras was the area where female prisoners showered. *Id.* at ¶ 28. Bridges alleges that male jailers, including Buzbee, escorted female inmates to and from the showers, where they observed them and encouraged them to provide "a show" while other male jailers watched on the monitors. *Id.* at ¶ 63.

Bridges also alleges that prior to her incarceration, male jailers engaged in sex with female inmates. *Id.* at ¶ 29. She states that "[a]t times preceding the events

described below and on other occasions," Johnson received reports of ongoing sexual harassment and abuse of female inmates by male jailers, but Johnson "failed and/or refused to act to stop that unlawful act." *Id.* at ¶ 3. Approximately three years before Bridges's confinement, at least one female inmate lodged an official complaint alleging inappropriate sexual harassment and abuse. *Id.* at ¶ 30. Additionally, in 2013, the Mayor of Carbon Hill, Alabama was indicted for having sex with female inmates in the municipal jail of that city. *Id.* at ¶ 31. The Mayor pled guilty to certain crimes in the United States District Court for the Northern District of Alabama. *Id.* According to Bridges's complaint, "Carbon Hill is less than 20 miles away from Jasper, and the Mayor's prosecution was well publicized, thus putting Poe and others on notice that female prisoners were at risk of sexual mistreatment." *Id.* at ¶ 32.

Shortly after Bridges began serving her sentence, she says it became apparent to her and others that Buzbee sexually desired her. *Id.* at ¶ 33. He allegedly gave her drugs and tobacco.[3] *Id.* at ¶¶ 34–35. He also allegedly made sexually suggestive comments about Bridges in her presence and in the presence of others. *Id.* at ¶ 37. According to Bridges, male jailers frequently made salacious remarks about female inmates. *Id.* at ¶ 60.

---

[3]     The City formally prohibited smoking and smokeless tobacco use in the Jail. Bridges alleges that she used tobacco prior to arriving at the Jail and that the discomfort of withdrawing from tobacco use can be severe.

After Bridges became a trustee, Buzbee allegedly summoned her to a laundry room on the first floor of the Jail. *Id.* at ¶ 38. This room contained a storage closet ("the First Floor Closet"). *Id.* at ¶ 39. Bridges alleges that the City failed to adequately surveil the First Floor Closet and its entry way with video cameras so that someone viewing the monitors could discern who entered or exited the closet. *Id.* at ¶ 40. Bridges alleges that Buzbee was aware of the First Floor Closet's inadequate surveillance and directed her to join him there. *Id.* at ¶ 42. After she entered the closet, Buzbee allegedly forcefully groped and kissed her, even though she resisted. *Id.* at ¶ 43. Bridges says that Buzbee continued to summon her to the First Floor Closet on other occasions where he would forcefully grope, fondle, and kiss her.

The second floor of the Jail contained a storage room ("Second Floor Room") where, among other things, the Jail maintained a freezer for frozen foods. *Id.* at ¶ 44. As part of her duties as trustee, Bridges loaded and unloaded food stored in the freezer. *Id.* at ¶ 45. Buzbee allegedly would summon Bridges to the Second Floor Room to assist with loading and unloading food, and once they were alone together, he would forcefully grope, fondle, and kiss her. *Id.* at ¶¶ 47–48. He also allegedly forced her to perform oral sex on him in the Second Floor Room. *Id.* at ¶ 49.

The Jail premises also included an outbuilding called the Connex. *Id.* at ¶ 50. Bridges alleges that the City failed to install video cameras in the Connex to allow

surveillance of the entry, exit, and interior of the building. *Id.* at ¶ 51. She further alleges that Buzbee directed her to accompany him to the Connex on multiple occasions and sexually molested her while they were alone together inside the building. *Id.* at ¶ 52. Buzbee allegedly tried to have vaginal intercourse with Bridges on one occasion but stopped when she alerted him to the sound of someone approaching. *Id.* at ¶ 53.

Bridges alleges that Buzbee was not the only jailer who sexually assaulted female inmates. *Id.* at ¶ 54. She alleges that Boyd assaulted inmates Charity Tessener, Whitley Goodson, Jessica Rainer, and Allison Mann while they were detained in the Jail. *Id.* Moreover, Bridges alleges that she was not the only inmate assaulted by Buzbee. *Id.* Buzbee allegedly forced inmates "XYZ" and "ABC" to have sex with him as well. *Id.* Poe, Johnson, and other jailers allegedly knew about this abuse. *Id.* Bridges even alleges that Poe "agreed" with Johnson, Buzbee, and Boyd that the jailers could sexually touch the female inmates and condition trustee status on sexual favors. *Id.* at ¶ 71.

She alleges that, in light of all of the circumstances, the failure of Poe to take measures to keep female inmates such as Bridges safe from sexual attack when such prisoners became trustees directly resulted in Buzbee's sexual assault of Bridges. *Id.* at ¶ 55. Finally, she alleges that Poe "had actual knowledge of or acted with reckless

disregard of the fact" that Bridges would be forced to commit sex acts and that she "would be subjected to a scheme and/or pattern of conduct that would make [her] believe that she would be subject to serious physical harm" if she failed to perform sex acts. (Doc. 59 at ¶¶ 113–14.)

## II.    STANDARD OF REVIEW

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  However, to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth." *Iqbal*, 556 U.S. at 679.  This Court then assumes the veracity of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* The Court must construe pleadings broadly and resolve inferences in the nonmoving party's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)).

## III.   DISCUSSION

Poe seeks dismissal of Bridges's state law claims, § 1983 claims, and TVPA claims.  This Court previously dismissed, without prejudice, Bridge's state law claims for assault and battery and for violation of ALA. CODE § 14-11-31.  It does so again in accordance with its earlier order. (Doc. 51.)  This Court will address Bridges's remaining claims in turn.

### A. § 1983 Supervisory Claim Against Poe

 To establish a claim under § 1983 against an individual, a plaintiff must show that a person acting under color of state law deprived her of a federal right. *Myers v.*

*Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013).  However, § 1983 does not extend this liability to supervisory officials based on a theory of respondeat superior or vicarious liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).  Instead, a supervisor can only be liable when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection" between the supervisor's actions and the constitutional deprivation. *Id.* Because Bridges has not alleged that Poe personally participated in any unconstitutional conduct, the viability of her supervisory claim depends on whether she plausibly alleged a causal connection between Poe's actions and the constitutional deprivation.

A plaintiff may establish this requisite causal connection in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinate would act unlawfully and failed to stop them from doing so." *Id.* (internal citations and quotation marks omitted).

### 1.  Failure to Correct Widespread Abuse

To show a causal connection through a history of widespread abuse, the alleged harassment "must not only be widespread, [it] also 'must be obvious, flagrant, rampant and of continued duration…' " *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting *Hartley* 193 F.3d at 1269). "A few isolated instances of harassment will not suffice." *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). *Accord Doe v. Sch. Bd. Of Broward Cty.* 604 F.3d 1248 (11th Cir. 2010) (finding two isolated incidents of alleged sexual misconduct by a teacher within a year was insufficient to prove widespread abuse). However, "[w]hen rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is a single 'bad apple' engaging in the repeated pattern of unconstitutional behavior." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004). *See also Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (denying summary judgment for a prison official when thirteen deprivations occurred across the prison over the course of one and a half years).

The currently pled facts sufficiently demonstrate widespread abuse. While Bridges does not allege specific dates of the alleged assaults, she alleges "numerous" instances of abuse in three separate locations.  Her allegations that six other inmates

were also abused by Buzbee and Boyd further demonstrate widespread abuse—not mere isolated occurrences. Indeed, these assaults are more akin to the prison abuse in *Valdes* than the isolated assaults in *Doe*.  Unlike in *Doe*, where only two assaults occurred at the hands of one teacher, here, multiple assaults occurred at the hands of multiple guards. Even if they hadn't acted in concert, as is alleged by the complaint, the multiplicity of both victims and perpetrators demonstrates that the abuse was sufficiently widespread to put Poe on notice.  By failing to install more cameras or discipline guards, Poe failed to correct this widespread abuse.  Therefore, Bridges has plausibly pled individual supervisory liability under § 1983.

### 2.  Policy Resulting in Deliberate Indifference

Bridges has also met her burden under the second method of individual supervisory liability—creation of a policy that results in deliberate indifference. According to the complaint, Poe, as Chief of Police, is the final policymaker. Bridges alleges that, as policymaker, Poe allowed a custom to develop whereby male jailers were allowed to make "salacious" remarks about female prisoners, enter the women's dorms unattended, accompany female inmates into inadequately surveilled areas, provide drugs and tobacco to female inmates, and condition trustee status on acquiescence to sexual advances. Bridges further alleges that "Poe . . . agreed with Boyd and Buzbee that [they] could sexually touch the women." Compl. ¶ 71. Taken

as true, each of these allegations constitute policies that "could have led [the perpetrator] to believe that sexual abuse of [the victim] was permitted." *Hartley*, 193 F.3d at 1269 (11th Cir. 1999). Thus, this Court must ask whether these policies and customs were deliberately indifferent to Bridges's rights.

Poe was deliberately indifferent to this mistreatment if he (1) "[had] subjective knowledge of a risk of serious harm" and (2) "[disregarded] that risk (3) by conduct that is more than gross negligence." *Franklin v. Curry,* 738 F.3d 1246, 1250 (11th Cir. 2013).  Bridges alleges Poe had subjective knowledge of the risk of abuse because he "actually observed at least some of the misconduct" on security cameras, compl. ¶ 63, and was warned by two different sources that jailers were forcing inmates to have sex with them. Compl. ¶ 54. Poe then disregarded this risk by failing to install more cameras or discipline his guards. Because these failures are allegedly an extension of Poe's agreement that Boyd and Buzbee could touch, harass, and seclude inmates, it amounts to more than gross negligence.

The complaint sufficiently demonstrates that Poe's policies resulted in deliberate indifference to Bridge's rights. Accordingly, Poe's motion to dismiss the § 1983 claim against Poe in his personal capacity is due to be denied.

### B. § 1983 Claim Against the City

The Court now turns to Bridges's § 1983 claim against Poe in his official

capacity, which the parties agree equates to a claim against the City of Jasper.  The actions of employees generally do not subject a municipality to liability in § 1983 actions.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  Instead, municipalities may be held liable under § 1983 only when an employee's alleged violation of a person's constitutional rights arises from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Id.* at 694.

To establish a municipality's liability under § 1983, "a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991)).

"Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).  Thus, municipal liability may be based on: "(1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).  Defendants did not challenge Poe's status as final policymaker.

For the same reasons discussed in Part III.A, the Court concludes that Bridges's complaint sufficiently alleges a custom or policy that deprived her of a constitutional right.  Bridges does not allege that the City's lawmakers adopted a formal policy of sexual abuse.  However, she does allege that Poe's acts qualify as official policy because he is the final policymaker for the Jail. As the final policymaker, Poe's alleged agreement with Buzbee and Boyd that the guards could sexually touch and harass female inmates constitutes a City policy. But even absent this express agreement, the widespread abuse described in Part III.A.1 demonstrates a "pervasive" custom of sexual abuse that is the functional equivalent of a policy. Accordingly, for the same reasons discussed in Part III.A, Poe's motion to dismiss

the § 1983 claim against Poe in his official capacity is **DENIED.**

## C. § 1983 Conspiracy

"To establish a conspiracy claim under § 1983, a plaintiff must show that "the parties 'reached an understanding' to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992) (citing *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990), *cert. denied*, 500 U.S. 932 (1991)). This Court has previously described the underlying actionable wrong in Parts A and B of this opinion. Thus, the only question is whether the parties reached an understanding to deny Bridges's constitutional rights. Although it is a close question, this Court finds that Bridges's alleged facts are sufficient to survive Poe's motion to dismiss.

Allegations of conspiracy cannot be conclusory. *Iqbal*, 556 U.S. at 679. In *Iqbal*, a Muslim man filed a complaint against the United States Attorney General and the director of the Federal Bureau of Investigation alleging that the Attorney General was the "architect" of an "unlawful policy of subjecting detainees to harsh conditions on account of race." *Id.* at 680–81. The Supreme Court found these allegations to be too conclusory to state a claim for relief. *Id.* at 681.

Bridges's complaint, on the other hand, alleges specific facts about the alleged conspiracy. First, Bridges lists the specific individuals who engaged in the

conspiracy—Poe, Johnson, Boyd, and Buzbee—rather than an entire federal agency. Second, Bridges alleges the specific terms agreed to by the parties—that the jailers could select which inmates could serve as trustees, escort them to secluded areas of the prison, and sexually touch them while evidence of this misconduct was displayed on video monitors. Unlike the allegations in *Iqbal*, which baldly recite the elements of a civil rights conspiracy based on race, Bridges's allegations are not legal conclusions, but specific allegations of fact.  Although Bridges does not describe dates or times that these agreements occurred, she does not need to. Requiring this information would heighten pleading standards beyond mere plausibility pleading. Bridges's allegations, taken as true, plausibly give rise to a claim of conspiracy.

For the preceding reasons, Bridges's conspiracy claim under § 1983 survives, and Poe's motion to dismiss is due to be denied on this ground.

**D. TVPA Claims**

The TVPA confers criminal and civil liability upon "whoever knowingly . . . entices, harbors, transports, provides, obtains, or maintains by any means a person" with the knowledge that "means of force, threats of force, fraud, [or] coercion described in (e)(2)" would be employed to "cause the person to engage in a commercial sex act." 18 U.S.C. §§ 1591(a), 1595.  It also establishes civil "venture liability" for anyone who "knowingly benefits, financially or by receiving anything

of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter . . . ." *Id.* § 1595(a).

Thus, to state a claim against Poe based on venture liability Bridges must first show that the jailers' recruitment of trustees in exchange for sexual favors violated § 1591 of the TVPA.  If there is, indeed, a substantive violation of § 1591, she must then show that Poe (1) knowingly benefitted from participation in this venture and (2) knew or should have known of this venture's violation of § 1591.

### 1.  Underlying § 1591 Violation[4]

A venture violates the TVPA when it "knowingly . . . entices . . . a person" with knowledge that "coercion" would be employed to cause the person to engage in a commercial sex act. 18 U.S.C. § 1591.  Black's Law Dictionary defines "entice" as "to lure or induce."  *Entice, Black's Law Dictionary* (11th ed. 2019).  The statute defines "commercial sex act" as any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3). Bridges alleges that Buzbee "enticed" her with drugs, tobacco, and a trustee position.  Because he held

---

[4]    To interpret a statute's meaning, a court must "look first to its language, giving the words used their ordinary meaning." *Moskal v. United States*, 498 U.S. 103, 108 (1990). To determine this ordinary meaning, courts generally look to dictionary definitions for guidance. *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018). However, when a term is defined within the statute, that definition "declares what the term means . . . [and] . . . excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392–393, n.10 (1979). If the statutory language is unambiguous, a court's analysis must end there. *Dixon v. United States*, 900 F.3d 1257, 1263–64 (11th Cir. 2018).

out these benefits for the purpose of "luring" Bridges into providing sexual favors, it fits within the ordinary meaning of "knowingly entice." Furthermore, by providing these valuable commodities to Bridges in exchange for sex, Buzbee participated in commercial sex acts within the meaning of the statute. Thus, the only question is whether Buzbee "coerced" Bridges.

The statute defines "coercion," in part, as "threats of serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2). Restraint is commonly understood as "something that limits the freedom of someone or something," *Restraint*, Cambridge Dictionary, https://www.dictionary. cambridge.org/us/dictionary/english/restraint. Other dictionaries explicitly define it as "confinement." *Restraint, Black's Law Dictionary* (11th ed.); *Restraint*, Dictionary.com, https://www.dictionary.com/browse/restraint (last visited Aug. 31, 2020).

Although Bridges claims multiple times that she "believed she would be subject to serious physical harm," these recitations are nothing more than a parroting of the statute. She lists no instances when she felt fearful of physical harm, and she describes no threats made by Buzbee. As such, these allegations are not entitled to an assumption of truth under *Iqbal*.

However, she does specifically allege that Buzbee threatened to revoke her

trustee status if she failed to perform sex acts.  Revocation of her trustee status would have resulted in confinement to her cell for twenty-three hours a day. "Confinement" to a jail cell that restricts an inmate's freedom of movement certainly meets the ordinary meaning of "physical restraint."  Buzbee's use of the prison system to effectuate this confinement makes no analytical difference.  Indeed, the statute makes no distinction between *methods* of restraint.  As such, Buzbee's threat of additional confinement qualifies as "coercion" within the meaning of the statute, and Bridges's claims give rise to a plausible inference of an underlying violation of § 1591.

### 2.  Benefit from Participation

In order to establish venture liability, the plaintiff must also show that the defendant knowingly benefitted from participating in the venture that violated § 1591.  See 18 U.S.C. § 1595(a). Section 1595 does not define "participation in a venture."  However, § 1591 defines that phrase as it relates to the criminal liability established within that section.  There, § 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating" the underlying offense. 18 U.S.C. § 1591(e)(4).  Although some courts have applied this same definition to § 1595's establishment of civil liability, others have found § 1595 to lack § 1591's scienter requirement. *Compare Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d

156, 168 (S.D.N.Y. 2019) (applying § 1591's definition of participation to § 1595) *with M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019) (finding that application of § 1591's scienter requirement to § 1595 would conflict with § 1595's liability for participants who merely "should have known" that the venture violated the TVPA). If there is participation in the venture, liability attaches if the defendant benefitted from this participation. 18 U.S.C. § 1595(a). But the definition of "benefit" is broad under § 1595—including "financial" benefits as well as "anything of value." *Id.*

This Court does not need to decide whether "participation" requires scienter, because Bridges "participated" in the venture even under a stricter "knowingly" standard. Bridges alleges that Poe agreed with Buzbee and Boyd that they could touch the inmates and condition membership in the trustee program on sexual favors. This agreement facilitated abuse by ensuring Poe would look the other way. Moreover, because it was an express agreement, Poe must have known that it would aid Boyd and Buzbee's venture.

The creation of this haven would have directly benefitted Poe. Indeed, Bridges alleges that Poe instructed the guards that they could touch the women "while evidence of this misconduct was displayed on video monitors." Compl. ¶ 71. By creating a haven for this kind of abuse, Poe received "something of value"—namely,

being able to watch abuse displayed on video monitors. Poe's participation in the sex

trafficking venture made it more likely that he could receive this voyeuristic benefit.[5]

### 3. Constructive Knowledge of Violation

Lastly, the defendant must have had constructive knowledge that the venture

in question violated the TVPA. A defendant's "ability to inspect the premises,"

alone, is insufficient to confer constructive knowledge of trafficking—even if indicia

of abuse are present. *Doe 1 v. Red Roof Inns, Inc.* No. 19-3840, 2020 WL 1872335 at

*3 (N.D. Ga. April 13, 2020) (finding that defendant hotel franchisor had no

constructive knowledge of trafficking in a franchisee's hotel that had clear indicia of

abuse when the franchisor was able to conduct inspections of the property but

plaintiff failed to allege that the franchisor ever actually saw any of the indicia).

However, indicia of abuse are enough to put a supervisor who likely saw those indicia

on notice. *S.Y. v. Naples Hotel Co.*, 20-118, 2020 WL 4504976 (M.D. Fla. August 5,

2020) (finding that hotel operators should have known about sexual abuse in the

---

[5]  Because the preceding allegation sufficiently alleges a benefit that flowed from Poe's participation in Boyd and Buzbee's abuse, this Court does not need to decide whether the manual labor provided by Bridges as a trustee would constitute a benefit under the statute as well. Indeed, because this manual labor was a result of the trustee program, this labor would only be a "benefit" from a venture that violated the TVPA if the "venture" in question is the trustee program, itself. Courts are split on whether liability under § 1595 can attach when an individual participates in a venture that is not specifically a sex trafficking venture, and participation is not direct participation in the sex trafficking. *Compare Jean-Charles v. Perlitz*, 937 F.Supp 2d 276, 288–89 (D. Conn. 2013) with *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d at 169. Because this element has been plausibly alleged on other grounds, and the scope of "venture" has not been fully briefed, the Court leaves this question for another time.

hotel when traffickers rented rooms with cash, multiple men came and went from rooms with no luggage or personal possessions, online reviews described prostitution occurring at the location, and older men escorted victims around the hotel).

The indicia of abuse allegedly present at the jail conferred constructive knowledge upon Poe.  Unlike the plaintiff in *Doe 1*, Bridges does not allege that Poe's constructive knowledge stems solely from his ability to inspect the jail. Instead, she alleges that he actually saw indicia of abuse, including jailers leading women to secluded locations, jailers parading women in front of cameras, and jailers making sexually explicit comments toward female inmates.  He even heard various reports of jailers having sex with inmates.  Because of these hallmarks of sexual abuse, Poe should have known that jailers were enticing women to have sex with them or compelling them to by force.  But even if these facts were insufficient to provide notice, Bridges also alleges that Poe specifically agreed with Buzbee that he could select trustees, transport them to secluded areas of the jail, and sexually touch them. Compl. ¶ 71.  Taken as true, this agreement would put Poe on notice that this abuse also violated the TVPA.

For the preceding reasons, Bridges's TVPA claim survives against Poe. Poe's motion to dismiss is due to be denied as to this claim.

### E.  State Law Claims

Bridges concedes that her assault and battery claim and her claim against Poe for violating ALA. CODE § 14-11-31 are due to be dismissed without prejudice. However, this leaves two claims still to discuss: Negligent Hiring and Negligent Supervision.

Before turning to the merits of Bridges's remaining state law claims, this Court must ensure that subject matter jurisdiction exists over the claims.  Bridges's remaining claims are state law claims between nondiverse citizens.[6]  Therefore, neither federal question jurisdiction nor diversity jurisdiction exists over them.  *See* 28 U.S.C. §§ 1331–32.  Accordingly, federal jurisdiction would only be proper if the state law claims meet the criteria for supplemental jurisdiction set forth in 28 U.S.C. § 1367.

It appears to the Court that it could exercise supplemental jurisdiction over the state law claims because they are "so related to [the § 1983 and TVPA claims] that they form part of the same case or controversy."  *See* 28 U.S.C. § 1367(a). S*ee also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Because both federal claims survive dismissal, this Court exercises supplemental jurisdiction over the relevant state law claims.

---

[6]     Bridges and Poe are both Alabama citizens.

However, because this Court has yet to discuss the merits of the state law claims, Poe has leave to challenge their merits at summary judgment.

**CONCLUSION**

For the reasons stated above, Poe's motion (doc. 69) is due to be granted in part and denied in part. Bridges's assault and battery claim and violation of Ala. Code § 14-11-31 claim against Poe are due to be dismissed without prejudice.  All other claims remain. A separate order dismissing said claims will be entered contemporaneously.

**DONE** and **ORDERED** on September 9, 2020.

L. Scott Coogler
United States District Judge

203171