

FILED
2022 May-19  AM 09:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| STACEY BRIDGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-00529-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CHARITY TESSENER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-01314-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| JESSICA RAINER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 7:19-cv-01392-LSC |
| vs. | ) | |
| | ) | |
| J.C. POE, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

WHITLEY GOODSON,            )
      Plaintiff,              )
                    )
      vs.                      )      6:19-cv-01399-LSC
                    )
J.C. POE, JR., *et al.*,    )
      Defendants.             )

---

MEGAN DUNN,                 )
      Plaintiff,              )
                    )
      vs.                      )      7:19-cv-01571-LSC
                    )
J.C. POE, JR., *et al.*,    )
      Defendants.             )

---

ALLISON MANN,               )
      Plaintiff,              )
                    )
      vs.                      )      7:19-cv-01961-LSC
                    )
J.C. POE, JR., *et al.*,    )
      Defendants.             )

## MEMORANDUM OF OPINION

Plaintiffs Stacey Bridges ("Bridges"), Charity Tessener ("Tessener"), Jessica Rainer (Rainer"), Whitley Goodson ("Goodson"), Megan Dunn ("Dunn"), and Allison Mann ("Mann") (collectively "Plaintiffs") bring this action against

Jasper Police Chief J.C. Poe, Jr. ("Poe"), former Chief Jailer Deborah Johnson ("Johnson"), former jailer Dennis Buzbee[1] ("Buzbee"), and the City of Jasper ("the City"), (collectively "Defendants"). The Court ordered on January 17, 2020, that the cases brought by the plaintiffs listed above be consolidated and designated *Bridges v. Poe, et al.*, as the lead case. (Bridges Doc. 26.) [2]

In Count I of her Third Amended Complaint, Bridges asserts § 1983 claims against Poe, Johnson, Buzbee, and the City for violations of her Fourth and Eighth Amendment rights. (Doc. 59 at 13-16.) In Count II, Bridges asserts a claim for conspiracy under § 1983 against Poe, Johnson, Buzbee, and the City. (*Id.* at 16-18.) Bridges brings a claim for negligent hiring against Poe in Count IV (*id.* at 19-20), and Count V asserts claims for negligent training and supervision against Poe, Johnson, and the City (*id.* at 20-21). In Count VII, Bridges brings a state law claim for outrage against Poe, Johnson, and Buzbee. (*Id.* at 24.) Bridges also asserts a claim in Count VIII against Poe, Johnson, Buzbee, and the City for sex trafficking under 18 U.S.C. § 1591, the Trafficking Victims Protection Act ("TVPA"). (*Id.* at 25-29.) In an order dated September 9, 2020, the Court granted Poe's motion to dismiss the claims that Bridges asserted against him for

---

[1] Only Plaintiff Bridges asserts claims against Defendant Buzbee. (*See* Bridges Doc. 59; Tessener Doc. 39; Rainer Doc. 7; Goodson Doc. 1; Dunn Doc. 7; Mann Doc. 1.)

[2] Unless specified otherwise, document numbers reference entries in the lead case, *Bridges v. Poe, et al.*, 7:19-cv.00529-LSC.

assault and battery in Count III and for violation of Alabama Code § 14-11-31 in Count VI.[3] (Doc. 89 at 25.)

Plaintiffs Tessener, Rainer, Goodson, Dunn, and Mann all bring claims in Counts I, III, and IV under § 1983 for Fourth and Eighth Amendment violations, negligent hiring and supervision, and negligent training, respectively. (Tessener Doc. 39 at 35-37, 40-44; Rainer Doc. 7 at 30-32, 34-39; Goodson Doc. 1 at 34-36, 39-43; Dunn Doc. 7 at 29-31, 34-38; Mann Doc. 1 at 29-31, 34-38.) The claims in Counts I and IV are against Poe, Johnson, and the City, but the claims in Count III are asserted against Poe in his individual capacity only.  (*Id.*) In Count II, they assert claims for conspiracy under 42 U.S.C. § 1985 against Poe, Johnson, and the City. (Tessener Doc. 39 at 37-40; Rainer Doc. 7 at 32-34; Goodson Doc. 1 at 37-39; Dunn Doc. 7 at 32-34; Mann Doc. 1 at 31-33.) Count V alleges a state law claim for outrage against Poe and Johnson, in their individual capacities. (Tessener Doc. 39 at 44-45; Rainer Doc. 7 at 39-40; Goodson Doc. 1 at 43-45; Dunn Doc. 7 at 38-40; Mann Doc. 1 at 38-40.) In Count VI, these plaintiffs sue Poe, Johnson, and the City for trafficking under the TVPA. (Tessener Doc. 39 at 46-49; Rainer Doc. 7 at 40-44; Goodson Doc. 1 at 45-48; Dunn Doc. 7 at 40-43; Mann Doc. 1

---

[3] Bridges also asserted claims against Johnson and Buzbee in Counts III and VI of her Third Amended Complaint. (Doc. 59 at 18-19, 22-24.) The Court did not resolve those claims in its order on Poe's motion to dismiss. (Doc. 89.) The parties did not address these claims in their respective briefs (docs. 132, 134, 151-2, 156, 157), so the merits of these claims are not considered in this opinion.

at 40-43.) In Counts VII and VIII, they assert claims against Poe and the City for intimidation and negligent failure to prevent conspiracy under 42 U.S.C. §§ 1985(2) and 1986, respectively. (Tessener Doc. 39 at 49-51; Rainer Doc. 7 at 44-46; Goodson Doc. 1 at 48-50; Dunn Doc. 7 at 43-45; Mann Doc. 1 at 43-45.) Count XI is a state law negligence claim against Poe and Johnson, without specifying whether they are sued in their individual or official capacities. (Tessener Doc. 39 at 53-54; Rainer Doc. 7 at 48-49; Goodson Doc. 1 at 53-54; Dunn Doc. 7 at 48-49; Mann Doc. 1 at 47-48.) This Court dismissed Counts IX and X against the Alabama Municipal Insurance Corporation in an order dated January 23, 2020. (Doc. 30.) The Court also dismissed all claims against Defendants Marcus O'Mary, Gilbert Jean, and Roger Wilson, who were sued in their official capacities as members of the Jasper Civil Service Board, by two orders dated February 6, 2020, and April 8, 2020, respectively. (Docs. 32 and 49.)

Before the Court are Defendants' motions for summary judgment.[4] (Docs. 131 and 133.) The motions have been briefed and are ripe for review. For the reasons stated below, Defendants' motions for summary judgment are due to be GRANTED. (Docs. 131 and 133.)

---

[4] Defendants also filed two motions to strike certain evidentiary material offered by Plaintiffs. (Docs. 158 and 159.) Because the Court reached its conclusions without needing to consider the evidence at issue in these motions they are TERMINATED as moot.

I.    **BACKGROUND**[5]

Poe has served as the Chief of Police for the City since December 17, 2014, and in that role, he is responsible for operation of the Jasper City Jail (the "Jail"), which reopened in February 2016 after being closed since December 2014. (Doc. 135-9 at 16, 47, 77.) Poe's office is located on the first floor of the police department, and the Jail is located on the ground floor. (*Id.* at 61.) Poe may visit the Jail once or twice a week, but he does not regularly walk through the Jail and, at the time of his deposition, had not visited the Jail in a month. (*Id.* at 63, 100-101.) David Mize ("Mize"), who was the Jail Administrator in 2017, claims that he would routinely visit the Jail two to three times a day, walking through the dorms, checking administrative inquires on the kiosk system, answering grievances, and helping jailers with issues. (Doc. 135-10 at 83.) Mize admitted that he did not necessarily do this every day, and Plaintiffs point to the Jail log book for November 2017 to dispute Mize's statement that he made multiple daily visits. (*Id.*; *see also* Doc. 135-29 at 1-53.) Mize testified that Johnson was responsible for the day-to-day operation of the

---

[5] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .")

jail and would call him if there were any issues. (Doc. 135-10 at 133.) Nurses are available to inmates twice a day and a doctor is provided on an as-needed basis. (Doc. 135–9 at 120.)

At the Jail, there is a kiosk located on the women's side of the jail so that women can submit any complaints they may have. (Doc. 135–10 at 90.) Mize received all of the administrative inquiries submitted by inmates through the kiosk system. (Doc. 135-10 at 85-86.) He stated that Poe and Assistant Chief Tucker had access to these inquiries, but Mize admitted that he was not sure they knew how to access them. Mize would always respond to the inquiries or bring them to the attention of Poe or Tucker if necessary. (*Id.*) Inmates could use the kiosk system to contact administrators, and the jailers did not have access to the kiosk inquiries. (*Id.* at 86.) Mize does not recall ever receiving grievances about sexual misconduct through the kiosk system. (Doc. 135-10 at 100-101.)

All incidents are documented in a logbook at the Jail. (Doc. 135–10 at 148–49.) In her role as Chief Jailer, Johnson was responsible for keeping the Jail logbook, making sure that all the inmates got to court, making sure the laundry was done, and maintaining the safety and security of the jail. (Doc. 135-9 at 58.)

Female trustees prepared meals and did laundry for the inmates at the Jail. (Doc. 135–22 at 70.) The trustees did not prepare meals or do laundry for the Jail's

employees. (*Id.*) The trustees were responsible for bringing dinners down from the upstairs freezer storage room, and Buzbee, one of the jailers accused of misconduct, would accompany the trustees to that room. (Doc. 135-14 at 42.) Mize testified that jailers were not authorized to appoint trustees without approval from Mize or Johnson. (Doc. 135-10 at 190.) Bridges agreed that Johnson was responsible for appointing inmates as trustees, but Rusty Boyd ("Boyd"), the other jailer accused of misconduct, at one point started selecting inmates to serve as trustees. (Doc. 135-1 at 198-99.) Bridges did not know who selected her to be a trustee. (*Id.*) Goodson testified that she "was out in the day with [Johnson] a lot," believing Johnson was a "trustee supervisor." (Doc. 135-5 at 116-17.) Rainer acknowledged that Johnson never knew she was a trustee, so she could not sign in and out like she did with Boyd when Johnson was on duty. (Doc. 135-4 at 176-77.)

At the time of the incidents referred to in the complaints, there were roughly sixty cameras located in the Jail. (Doc. 135–10 at 175.) The cameras could only be repositioned manually. (*Id.* at 179.) The on-duty jailers are responsible for watching the images captured by the cameras. (Doc. 135–9 at 170.) Poe does not know how many cameras were in the Jail or any information about the specifics concerning the cameras. (*Id.* at 161.) He can view the images captured by the cameras in his office, and he monitors the booking area, car wash area, and sometimes the male dorm when

there are a lot of inmates. (*Id.* at 171-72.) However, Poe never reviews the recordings because he does not know how to do so. (*Id.*) Mize was the one who would normally review recorded footage, but he would only review the footage if there was an incident. (Doc. 135-13 at 97; Doc. 135-10 at 181.) Mize was the administrator responsible for authorizing access to camera recordings. (Doc. 135-9 at 164.) Mize believed that Poe "probably" had access to the recordings but was unsure whether Johnson had access. (Doc. 135-10 at 174.) Mize was able to view the images captured by the cameras remotely with his work laptop. (*Id.* at 181.) According to Boyd, it was common knowledge among jailers and inmates that there were blind spots that were not covered by the cameras in the Jail. (Doc. 135-15 at 49.) The cameras monitor the female shower area, but do not show inside the individual stalls. (Doc. 135-9 at 124–27).

Poe does not know how often inmates are allowed to shower or whether there was a designated shift for showering. (Doc. 135-9 at 122-23.) Mize was not aware of any written policy with regard to how often inmates could shower. (Doc. 135-10 at 161.) The time of the day that female inmates showered was generally coordinated by Johnson. (Doc. 135–10 at 161.) Johnson did not recall a written policy on when an inmate could shower in 2017, but they would be allowed to shower daily if time permitted. (Doc. 135-13 at 63.) The on-duty jailer would take a female inmate to the

shower. (Id.) If the on-duty jailer was male, the procedure would be to escort the inmate to the shower cell door, lock her in, and leave the dorm. (*Id.* at 161–62.) Raeven Clay ("Clay"), a jailer on staff in 2017, testified that a group of female inmates complained that Boyd or Buzbee would flip the lights on and off when the inmates were showering. (Doc. 135-21 at 36.) Boyd was unaware of any written policies about inmate showers, but inmates generally showered on the evening shift and the showers were logged in the logbook. (Doc. 135-15 at 36-37.)

In 2017, the Jail was budgeted for nine or ten jailers, but Poe did not know how many were actually on staff at that time. (Doc. 135-9 at 77-78.) Poe was responsible for contacting the Civil Service Board when the Jail was understaffed, and the Board would recruit candidates for the position. (*Id.* at 78-79.)

As Jail Administrator, Mize was involved in the process of recruiting, screening, and hiring jailers. (Doc. 135-10 at 84.) The City conducted two background checks on Boyd, neither of which showed any history of sexual misconduct. (Doc. 135-24 at 1; Doc. 135-30 at 72-86.) However, these checks were performed on February 27, 2017, and August 15, 2017, after Boyd was hired as a jailer on January 27, 2017. (Doc. 135-30 at 72-86, Doc. 135-29 at 54.) The City also received letters of recommendation for Boyd. (Doc. 135-24 at 1; Doc. 135-30 at 69-71.)

The only requirements to be hired as a jailer at the Jail were having a driver's

license, being a U.S. citizen, having a high school diploma or GED, and passing an exam administered by the Civil Service Board. (Doc. 135-9 at 79; Doc. 135-13 at 40.) Johnson does not recall whether she ever hired anybody without jail experience. (Doc. 135-13 at 40-41.)

Mize was not aware of a written policy outlining the training requirements for the position of Chief Jailer. (Doc. 135-10 at 134.) There is some dispute about the minimum training required for jailers at the Jail. Mize testified that they had to be trained on the use of force, including the use of tasers and chemical spray, and shortly after a jailer was hired, he or she would have to be trained on CPR, suicide awareness, and medical assessments before he or she could staff the Jail alone. (Doc. 135-10 at 165.) On-the-job training was also provided by Johnson and the other jailers. (*Id.*; Doc. 135-13 at 33-37.) Jail School was an option for jailers, but Poe did not know how many of the jailers at the Jail in 2017 or those currently employed attended. (Doc. 135-9 at 87.) Johnson was not aware of any written policies that define sexual abuse in a custodial setting. (Doc. 135-13 at 112-14.)

Mize was also the immediate supervisor of Johnson. (Doc. 135-10 at 136.) Mize claims that he and Johnson were responsible for making the schedules for jail employees. (*Id.*) However, Johnson testified in her deposition that she made the schedules unless she needed to consult with Mize on a problem. (Doc. 135-13 at 54.)

When Johnson was making the schedule, she would consider who was available and try to schedule a male and a female on each shift. (*Id.* at 56.)

Dennis Buzbee was hired as a jailer on July 18, 2016. (Doc. 135-29 at 59.) When hired, he had a high school diploma and no prior experience as a corrections officer. (Doc. 135-14 at 15-16.)

Buzbee usually worked from 4:00 p.m. to midnight, and Johnson was usually gone by the time Buzbee came in for work. (*Id.* at 35.) Buzbee does not know if Poe was there when he was working and could not recall how often Poe came down to the Jail. (*Id.* at 35-36.) Likewise, Buzbee usually did not know whether Mize was working when he arrived for his shift. (*Id.* at 36.)

Buzbee stated that he had discussions about how to treat trustees in the Jail. Jailers were supposed to "[t]reat them like a person." (Doc. 135-14 at 54.) He relied on his common sense to know that a male jailer was not to engage in sexual conduct with female inmates. (*Id.* at 56.) Buzbee did not know if there were policies in writing about male jailers entering a female dorm or escorting female inmates to the shower. (*Id.* at 50-51.)

On January 27, 2017, the City hired Boyd as a jailer. (Doc. 135-29 at 54.) Boyd was never interviewed by Poe, Mize, or Johnson. (Doc. 135-15 at 82.) Boyd was not aware of any written job description for the jailer position, but he was aware of a rule

book, although he never read it. (*Id.* at 24-25.) He testified that he has never previously been fired from a job over any allegations of sexual misconduct. (*Id.* at 101.) Boyd had a high school education but no training as a jailer. (*Id.* at 10-16.) Boyd received on-the-job training from Clay, Buzbee, and the other jailers he worked with, and he also took classes in the use of chemical spray and tasers. (*Id.* at 26.)

The alleged events giving rise to the claims set forth in Plaintiffs' complaints span approximately a year, beginning with the allegations of Stacey Bridges. On February 5, 2017, Bridges began serving a 90-day sentence at the Jail for a misdemeanor conviction. (Doc. 135–1 at 15.) Around the middle or end of March 2017, Bridges became a trustee. (*Id.* at 196.) It is in dispute as to whether Buzbee had any influence over her selection as a trustee. (Doc. 151-2 at 11.) While Buzbee never threatened to take her trustee status away if she did not have sex with him, Bridges stated that she believed she would be removed as a trustee if she did not reciprocate his advances. (Doc. 135–1 at 201, 204, 210, 318.)

During her time at the Jail, Bridges claims that Buzbee groped her three or four times a week, tried to kiss her and grabbed her buttocks in the closet downstairs, and attempted to kiss her on approximately five other occasions. (*Id.* at 201–206.) Bridges also claims that Buzbee asked her to put on jail pants with a hole in the crotch and meet him in the women's restroom for sex. (*Id.* at 207–09, 291–92.) Further,

Bridges stated that Buzbee penetrated her with his fingers. (*Id.* at 355–57.) On a separate occasion near the end of March or April, Bridges claims that Buzbee pulled her behind the water heater, pushed her to her knees, and forced her to perform oral sex on him. (*Id.* at 194–97, 210–12, 292.) Bridges stated that she and Buzbee did not have sexual intercourse. (*Id.* at 209.) Bridges also stated that Buzbee provided her with tobacco and pain pills. (*Id.* at 191, 239–40.) Bridges felt as though Buzbee wanted sex in exchange for those pills and tobacco. (*Id.* at 395–98.) Buzbee denies giving Neurontin to Bridges and does not know if he was taking Neurontin in 2017 or if it was ever prescribed to him. (Doc. 135-14 at 78.)

Bridges told Inmate Wendy Odom about the incidents between her and Buzbee while they were both incarcerated but did not tell anyone else during her time in jail. (*Id.* at 194-95.) Bridges testified that she told Clay about what happened with Buzbee after she was released from the Jail in May 2017 because she considered Clay a friend, but Bridges asked Clay not to tell anyone. (Doc. 135-1 at 171-73.) Clay denies that Bridges complained to her about sexual misconduct and stated that if she had ever received that kind of complaint, she would have reported it. (Doc. 135-21 at 37.) After being released from the Jail, Bridges also told her father and Brett Calvert, who is Bridges's cousin and Poe's nephew, about her experiences in the Jail, but never told Poe. (Doc. 135-1 at 237, 268, 376.) Nor did Bridges ever inform Johnson, former

jailer Monique Softley ("Softley"), the jail nurse, or the jail doctor about anything Buzbee did to her. (*Id.* at 175–76, 282–83, 285-87).

Rainer began serving her sentence on July 2, 2017. (Doc. 135-4 at 22-24.) Next, Goodson's sentence began on July 17, 2017. (Doc. 135-5 at 21-22.) Tessener started serving her sentence sometime in August 2017 (doc. 135-3 at 54), along with Mann and Dunn, whose sentences began on August 2 and August 9, respectively (doc. 135-8 at 53; doc. 135-7 at 12).

Rainer became a trustee during the last two weeks of her sentence. (*See* Doc. 135-7 at 12; Doc. 135-4 at 22-24, 63.) Rainer had an outstanding warrant, which she claims Boyd told her that he "ha[d]n't forgot about." (Doc. 135-4 at 97-98.) Rainer further alleges that Boyd said that he was "going to see what [he could] do about it," but he wanted to "see if [she could] still handle being a trustee for the next two days first." (*Id.* at 98.) While Rainer admits that Boyd did not threaten her or tell her outright that he would take care of the warrant if she had sex with him, that is what she took his statements to mean because the next day he made her have sex with him. (Doc. 135-4 at 98-104, 143-46, 195.)

Rainer stated that, on one occasion during her two-week period as trustee, Boyd put his hand down her pants, rubbed her crotch, kissed her neck, and asked if she liked oral sex but stopped when he heard a door open. (Doc. 135-4 at 87–88.)

Rainer tried to avoid Boyd after that but claims the next day Boyd forced her to have sex with him on the freezer and on the floor. (*Id.* at 87-88, 99-101.) Rainer claims that when she told Boyd to stop, he did. (*Id.* at 101–102.)  Rainer and Boyd did not have any further sexual contact. (*Id.* at 106.)

Rainer went back to her cell the night she had sex with Boyd and told Whitley Goodson, another inmate, what happened. (*Id.* at 105.) Rainer also told another inmate, Shyanne Russell, about what happened with Boyd. (*Id.* at 125.) Rainer did not tell Mize, Johnson, Jailers Jonathon Long, Raeven Clay, or Monique Softley, or the nurse or doctor what happened with Boyd while she was in jail. (*Id.* at 95, 178.)

Rainer testified that no one other than Ashley Williams told her that they had sex with Boyd or Buzbee, but Rainer did state that three inmates, Connie Key, Ashley Williams, and Barbara, told her about inappropriate behavior from Boyd, including pulling them into the closet and kissing them. (Doc. 135-4 at 63, 65, 74.) Rainer was released on August 24, 2017, after which she told her mother about what happened. (*Id.* at 135-4 at 22-24; 141.)

After her second court appearance in late August 2017, Boyd transported Goodson back to the jail and told her he was going to make her a trustee. (Doc. 135-5 at 142-43, 149.) Goodson knew Boyd from her time at a rehabilitation center he ran with his wife. (Doc. 135-5 at 131-32.)

Goodson described four specific incidents of inappropriate conduct by Boyd, all occurring in September 2017. (*Id.* at 153-65; 172-77.) Goodson claims that Boyd zapped her with a taser while she was taking out the trash. (*Id.* at 153–58, 165.) She also alleges that while Boyd was talking to Buzbee, Boyd used her to demonstrate a restraint tactic he had used on a male arrestee. (*Id.* at 159–62, 165.) Goodson further claims that Boyd showed Goodson and another inmate a pornographic video on his phone and grabbed her pants leg to prevent her from leaving while the video was playing. (*Id.* at 163–65.) Goodson claims that Buzbee was present during this incident. (*Id.*) She also alleges that, at the end of September, she had sex with Boyd. (*Id.* at 172–77.) Goodson stated that on another occasion Boyd told her to kiss Dunn in the connex while they were moving mats. (*Id.* at 95–97.) Dunn, however, testified that this did not happen. (Doc. 135–7 at 86–87.) Goodson also claimed that Boyd told her he was going to talk to the judge and make her stay in jail longer and that the judge in fact made her stay in jail an additional 90 days. (Doc. 135-5 at 125-27, 241-42.)

Goodson admitted that she would call Boyd sometimes to chat from the Walker County Jail, asked if he missed her as a trustee because of all the work she had done around the Jail, and told him she was thinking about him. (*Id.* at 183-84, 220, 281.) She also described an occasion when Boyd called her at work to tell her

that the ABI would want to talk with her and that she should tell them the truth. (*Id.* at 228, 260.)

Goodson stated that she wanted to keep what happened with Boyd quiet and did not want her husband to know. (*Id.* at 333.) However, Frank Goodson stated that based on his training and experience as a jailer in the Walker County Jail, he suspected that Goodson had been the victim of sexual exploitation and reported his suspicions to John Softley, a former investigator at the Walker County District Attorney's office and then an employee of the City. (Doc. 147-3.)

Dunn's encounters with Boyd were on her last three days of incarceration - September 23rd, 24th and 25th. (Doc. 135-7 at 164-67.) Dunn claims that, on or about September 24, 2017, Boyd took her upstairs to the freezer room and pinched her buttocks going up the stairs. (*Id.* at 90.) While she was getting meals out of the freezer, Boyd asked Dunn if she would tell anyone if he wanted to have sex with her and she told him no. (*Id.* at 93.) Boyd told her they could meet there for sex the next night. (*Id.* at 94.) Dunn claims that Boyd took her upstairs on September 25, 2017, the night before her release, where he grabbed her breasts and put his hand down her pants. (*Id.* at 97–98.) She asked Boyd to stop, and he stopped. (*Id.*) They did not have sex. (*Id.*) Boyd waited until Johnson left to let Dunn out of her cell on the nights of the alleged incidents, and Dunn did not complain to Johnson about Boyd or other

jailers and does not know anyone who did. (*Id.* at 88-90, 165–67.) However, Dunn told Goodson about Boyd grabbing her breasts and putting his hands down her pants. (*Id.* at 101–103.) Dunn was released from Jail on September 26, 2017. (*Id.* at 131.)

Goodson was released two days later on September 28, 2017. (Doc. 135-5 at 21-22.) Goodson then talked to her husband and mother about the incidents with Boyd, but she did not say anything to anyone at the City. (*Id.* at 172, 224, 229, 269).

In October 2017, Mann became a trustee. (Doc. 135-8 at 82-83, 108.) Mann testified that Boyd never threatened her physically and did not threaten to take away any privileges. (*Id.* at 127–28.) The two incidents of sexual misconduct about which Mann complains both occurred in October of 2017. (*Id.* at 129.) Mann claims that, on one occasion in mid-October, Boyd forced her to perform oral sex. (*Id.* at 122–23.) On another occasion in late October, she asserts that Boyd had sex with her, ejaculated onto the floor, and gave her a towel to clean it up. (*Id.* at 109–19.) Mann told Charity Tessener about both incidents, but she did not tell anyone at the City. (*Id.* at 119, 139-40, 183.) While Mann testified that Boyd did not offer her anything for sex, he did ask if she liked to fish and told her that he had a pond where he lived, which Mann took as an indication that he would probably pay for sex after she was released. (*Id.* at 128, 220.) She also testified that after Boyd had sex with her, he was off work until right before she was released. (*Id.* at 153.) Mann was released on

November 9, 2017. (*Id.* at 53.)

Tessener also knew Boyd from her stay at a rehabilitation facility that he and his wife ran. Tessener was there for eleven months. (Doc. 135-3 at 63-64.) The Boyds did not live at the facility. (*Id.* at 64-65.) She only saw Rusty Boyd when he needed to be there to handle any kind of disciplinary issues. (*Id.* at 64.) Tessener saw Boyd at the Jail for the first time in August 2017. (*Id.* at 62.)

Tessener became a trustee at the Jail in October 2017. (Doc. 135-3 at 183.) Tessener stated that during that month Boyd asked her to perform sexual acts and put her on lockdown when she refused. (*Id.* at 184–85, 192–94.) Also in October 2017, Tessener claims Boyd touched her buttocks in the laundry closet and on another occasion masturbated in front of her. (*Id.* at 197–98, 206–208.) Tessener further alleges that Boyd had sex with her against her will in the laundry closet two to three times a week. (*Id.* at 225.) She also said that Boyd forced her to perform oral sex on him after Thanksgiving. (*Id.* at 247–49.)

While she was incarcerated, Tessener told Valerie Currington, another inmate, about some of the incidents. (*Id.* at 119–122.) Tessener also told Mann that Boyd was being "too touchy-feely" with her but never told her that Boyd had sex with her. (*Id.* at 92.) Tessener told Clay around the first of December that she did not want to be alone with Boyd but did not say why. (*Id.* at 132.) When Clay described

this conversation, she remembers Tessener asking to be put up when Clay went to lunch rather than asking not to be left alone with Boyd. (Doc. 135–21 at 44.) Tessener also told Clay that Boyd made her go in the closet with him, that he had ejaculated in front of her, that he made her clean it up with a towel, and that she still had the towel. (Doc. 135-21 at 45-46.) Clay told the SBI that Tessener told her about the towel several weeks before her interview with the SBI. (*Id.* at 71-72.) Clay testified that she did not know of any sexual misconduct in the Jail until Tessener told her about the towel, but she never reported any sexual misconduct to Johnson or Mize. (*Id.* at 66-67.)

Tessener never personally told Poe about Boyd's actions but claims to have written him a letter reporting Boyd's behavior, which she asked Softley to deliver because she trusted her not to read it.  (Doc. 135–3 at 138–40, 143.) Tessener did not talk to Johnson about Boyd. (*Id.* at 164–65.) Nor did she complain to the nurse or dentist about Boyd's alleged conduct. (*Id.* at 168.) Tessener was transferred to the Walker County Jail in January 2018 and released in March 2018. (Doc. 135-3 at 59.) After being released, Tessener talked to her husband about Boyd but did not tell him Boyd had sex with her. (*Id.* at 154–160.)

None of the Plaintiffs contend that they used the kiosk system to report these alleged instances of misconduct by the jailers. (Docs. 135–1 at 156, 256; 135-3 at 264;

135-4 at 178; 135-5 at 242-43; 135-7 at 160, 166; 135-8 at 182.)

Softley testified that the only report of sexual misconduct in the Jail was from a male inmate named Charlie Nalls who told her that Jonathon Long was having sex with Tessener. (Doc. 135-16 at 43, 67.) Softley told Johnson of Nalls's report in early November. (*Id.* at 40-42, 90-92.) She also testified that she made a note of the information Nalls gave her in the Jail logbook. (*Id.* at 41.)  The logbook does not reflect this notation, but Plaintiffs contend that several pages in the record produced by Defendants seem to be missing. (Doc. 135-24 at 2; Doc. 135-29 at 1-53.)

Johnson admitted to hearing rumors of "dirty talking" by Jonathon Long. (Doc. 135-13 at 123-24.) Johnson stated that she heard these rumors two or three weeks prior to her interview with the ABI (SBI), which occurred on January 26, 2018. (*Id.* at 121-23.) However, Plaintiffs point to a written statement by Mize describing a discussion with Johnson on January 10, 2018, about rumors of Jon Long having sex or trying to have sex with Charity Tessener. (Doc. 135-13, Ex. 6.) Mize stated that he asked Johnson when she was told about this conduct, and "she said a while back." (*Id.*) Johnson did not complete an incident report after hearing about the sexual relationship between Long and Tessener. (Doc. 135-13 at 138-39.) She did not recall ever hearing of complaints about sexual "dirty talking" or misconduct by Boyd. (Doc. 135-13 at 149-50.)

Boyd is aware that the things he is accused of are wrong. (Doc. 135-15 at 29.) Boyd knew that jailers were not allowed to give food to the trustees, but sometimes he would do it anyway. (*Id.* at 21.) Tessener acknowledges that while Boyd would sometimes share candy or extra food with her, he never said it was in exchange for sexual favors. (Doc. 135-3 at 276.) At other times Boyd would provide money to some of the inmates, including giving money to Goodson on five or six occasions and giving inmate Joey Shyanne Russel $100 for rehab. (Doc. 135-15 at 59-60, 72.) Boyd also gave Rainer $20 on two separate occasions and $80 on a third occasion. (*Id.* at 76.) Tessener testified that Boyd put $20 on her account at the Jail one time, but Boyd denies ever putting any money on Tessener's books. (Doc. 135-3 at 276, Doc. 135-15 at 62.) Tessener stated that he never provided her with drugs or cigarettes while she was in the Jail. (Doc. 135-3 at 305-306.)

On January 11, 2018, Boyd was placed on administrative leave, and after completion of an SBI investigation, he was allowed to resign on April 23, 2018. (Doc. 135-15 at 55-58.) He was ultimately indicted on two counts of custodial sexual misconduct. (Doc. 147-2.) Buzbee resigned from his position as jailer on November 14, 2018, due to pre-existing back problems. (Doc. 135-29 at 62-63.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact[6] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment."

---

[6] A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

*Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and a "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

The claims by the Plaintiffs in these consolidated cases are substantially similar, however, the claims raised by Plaintiff Stacey Bridges are different enough to warrant a separate analysis. The claims and arguments by the remaining plaintiffs, Charity Tessener, Jessica Rainer, Whitley Goodson, Megan Dunn, and Allison Mann, are similar enough that the Court will analyze them together to the extent possible and address any important differences in the nature of their claims, the facts

they allege, or the arguments raised by the parties as necessary.

## A. JURISDICTION OVER DEFENDANT BUZBEE AS TO BRIDGES'S CLAIMS

As an initial matter, the Court must address a jurisdictional issue raised by Defendant Buzbee. Buzbee asserts that all of Bridges's claims against him, both state and federal, are due to be dismissed because the Court lacks personal jurisdiction to adjudicate the claims due to insufficient and improper service of process. The Court agrees.

"Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served." *Paradazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). Challenges to service of process will be waived, however, if not raised under Federal Rule of Civil Procedure 12. *See id.* Under Rule 12, a defendant must raise any challenge to the sufficiency of service of process in the first response to the plaintiff's complaint; i.e., the defendant must include the defense in either its pre-answer motion to dismiss, or if no pre-answer motion is filed, then the defense must be included in the defendant's answer. *See* Fed. R. Civ. P. 12(b), (g), (h).

Federal Rule of Civil Procedure 4(e) provides for service of process in the following ways:

**(1)** following state law for serving a summons in an action brought in

courts of general jurisdiction in the state where the district court is located or where service is made; or

**(2)** doing any of the following:

> **(A)** delivering a copy of the summons and of the complaint to the individual personally;
>
> **(B)** leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>
> **(C)** delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Alabama's rules allow for service or process

> by serving the individual or by leaving a copy of the summons and the complaint at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and the complaint to an agent authorized by appointment or by law to receive service of process.

Ala. R. Civ. P. 4(c)(1).

Buzbee properly raised the issue of defective service in his answer to Bridges's Third Amended Complaint. (Doc. 85 at 25-26.) Bridges did not follow any of the methods provided for by Federal or Alabama law in attempting to serve Buzbee. Buzbee has submitted evidence in the form of an affidavit from his mother, Carla Buzbee, stating that on March 3, 2020, a man came to her home and asked if her son, Dennis Buzbee, lived there. (Doc. 46-1.) After she informed the man that Mr. Buzbee did not live with her, the man told her that he had "papers to be served on [her] son and [she] advised that gentleman that [she] did not have authority to accept service of the papers." (*Id.*) In spite of being informed that Mr. Buzbee did not live at the

home and that Carla Buzbee did not have authority to accept them, the man gave the papers to the defendant's mother. (*Id.*) Carla Buzbee's affidavit declares that her son has not lived with her or at the address where service was attempted for twenty-five years and that she did not give the papers she received from the man to her son. (*Id.*) Since this failed attempt at service, Bridges has been put on notice that service was insufficient (docs. 46, 71-72, 85 at 25-26, 134 at 24 n.13), and she admits that she has not served Buzbee (doc. 54 at 5).

Because Buzbee never received sufficient service of process, this Court lacks jurisdiction over him and cannot reach the substance of the claims against him. Accordingly, Bridges's claims against Buzbee are due to be dismissed without prejudice.

### B. CLAIMS BY PLAINTIFF STACEY BRIDGES

The Court now turns to the substance of Plaintiff Stacey Bridges's claims against the remaining defendants, Poe, Johnson, and the City.

#### 1. Count I: Unlawful Detention and Cruel and Unusual Punishment

In Count I, Bridges alleges that Poe and Johnson, both in their individual and official capacities, violated her rights as guaranteed by the Fourth and Eighth Amendments of the United States Constitution as made applicable to the States by the Fourteenth Amendment and enforceable under 42 U.S.C. § 1983 by "allow[ing]

a custom and practice to develop at the Jail arising to a policy, thereby authorizing male jailers to sexually mistreat female inmates." (Doc. 59 at 13-16.) Defendants Poe and Johnson argue that summary judgment is due to be granted for several reasons: (1) Bridges has not pled any facts to support a Fourth Amendment violation because a prison official's custodial sexual assault of an inmate is properly considered as a violation of Plaintiff's Eighth and Fourteenth Amendment rights (doc. 132 at 26); (2) Bridges has failed to produce evidence in support a § 1983 supervisory claim against Poe and Johnson (doc. 132 at 23-34); (3) Bridges has failed to produce evidence to support her § 1983 claim against the City (doc. 132 at 34-37).

In her response, Plaintiff did not specifically address the issue of whether the facts she alleged in her complaint could support a § 1983 claim based on violation of her Fourth Amendment rights, but she challenges Defendants' assertions that she has not provided evidence to support her claims.

### a. Fourth Amendment Violation

Bridges's Third Amended Complaint alleges that "… Poe and Johnson violated [her] rights, as guaranteed by the Fourth and Eighth Amendments of the United States Constitution, as such amendments are made applicable to the States by the Fourteenth Amendment of the United States Constitution and made actionable by 42 U.S.C. § 1983." (Doc. 59 at 15.)

Defendants argue that Bridges did not plead facts or produce evidence during discovery to support a Fourth Amendment violation, and they further contend that the Eighth and Fourteenth Amendments, rather than the Fourth, are the proper avenues for claims of custodial sexual abuse. (Doc. 132 at 26-27.) Bridges does not address these arguments in her brief.

In support of their argument that Bridges's claims are not properly founded on the Fourth Amendment, Defendants cite several cases, including *Boxer X v. Harris*, 437 F.3d 1107 (11th Cir. 2006), which explains that such a claim is properly brought under the Eighth Amendment for cruel and unusual punishment and the Fourteenth Amendment for a violation of the right to bodily privacy, without any discussion of the propriety of bringing a claim under the Fourth Amendment. *Id.* at 1110-11. (*Id.*)

In *Powell v. Barrett*, the Eleventh Circuit noted a Fourth Amendment right to bodily privacy for jail inmates. *Powell v. Barrett*, 541 F.3d 1298, 1314 n.7 (11th Cir. 2008) ("[J]ail inmates retain a right to bodily privacy that implicates the Fourth Amendment." (citing *Fortner v. Thomas*, 983 F.2d 1024, 1026 (11th Cir. 1993))). Bridges does not assert a claim for violation of her bodily privacy rights, instead couching her claim in her right not to be unlawfully detained. (Doc. 59 at 13.)

Bridges has cited no cases establishing a Fourth Amendment right of a

convicted prisoner against unlawful detention. Nor has this Court uncovered any. Without establishing that such a right exists, Bridges cannot make out a claim for unlawful detention under the Fourth Amendment. Defendants' motion for summary judgment is due to be GRANTED.

### b. Section 1983 Supervisory Claim Against Poe and Johnson

To establish a claim under § 1983 against an individual, a plaintiff must show that a person acting under color of state law deprived her of a federal right. *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013). However, § 1983 does not extend this liability to supervisory officials based on a theory of respondeat superior or vicarious liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citing *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). Instead, a supervisor can only be liable when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection" between the supervisor's actions and the constitutional deprivation. *Id.* Because Bridges has not alleged that Poe and Johnson personally participated in any unconstitutional conduct, the viability of her supervisory claim depends on whether there is a material issue of genuine fact as to whether a causal connection between Poe's and Johnson's actions and the constitutional deprivation exists.

A plaintiff may establish this requisite causal connection in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinate would act unlawfully and failed to stop them from doing so." *Id.* (internal citations and quotation marks omitted).

### i.      Failure to Correct Widespread Abuse

To show a causal connection through a history of widespread abuse, the alleged conduct "must not only be widespread, [it] also 'must be obvious, flagrant, rampant and of continued duration...'" *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006) (*quoting Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). "A few isolated instances of harassment will not suffice." *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998); *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248 (11th Cir. 2010) (finding two isolated incidents of alleged sexual misconduct by a teacher within a year was insufficient to prove widespread abuse). However, "[w]hen rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability,

even if it is a single 'bad apple' engaging in the repeated pattern of unconstitutional behavior." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004). *See also Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (denying summary judgment for a prison official when thirteen deprivations occurred across the prison over the course of one and a half years).

Defendants argue that Bridges provides no evidence of reports of sexual misconduct reaching Poe or Johnson before Bridges was released on May 12, 2017. (Doc. 132 at 31-35.) Defendants reason that they could not prevent constitutional violations of which they were unaware. (*Id.*) Plaintiffs' Amended Consolidated Response Brief only addresses customs and practices that caused a violation of their rights without any specific discussion of Defendants' alleged failure to correct widespread abuse. Further, Bridges has not presented evidence to suggest that the alleged abusive behavior was so widespread during her incarceration that it was "obvious, flagrant, rampant, and of continued duration." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).

Accordingly, summary judgment in favor of Defendants is appropriate under this theory. The Court will now consider whether Bridges can survive summary judgment under a theory that Defendants had a policy resulting in deliberate indifference that deprived her of a constitutional right.

## ii.    Policy Resulting in Deliberate Indifference

"Deliberate indifference requires the following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331–32 (11th Cir.2013)). Defendants' argument for summary judgment on this issue is based only on the first element, their subjective knowledge of the harm. (Doc. 132 at 35-40.)

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held,

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

Bridges does not clearly identify one specific policy she alleges deprived her of her constitutional rights. Instead, she points to a lack of written policies, training, supervision, discipline, and credible leadership, as well as a failure to report or investigate reports of misconduct as examples of what Plaintiffs complain of elsewhere as a "policy of hear no evil, see no evil, and speak no evil." (Doc .151-2 at 187-95, 203.) Plaintiffs focus, however, on the failure to train guards about sexual exploitation of inmates as the most glaring deficiency that allegedly gave rise to a

policy of allowing jailers to engage in such conduct. (*Id.* at 192- 95.) As discussed in more detail in Section III.B.1.c. below, Bridges has not provided evidence to establish that training on this topic was necessary such that a failure to train rose to the level of a policy of deliberate indifference to Bridges's constitutional rights.

Bridges has presented no evidence that Defendants were subjectively aware of a serious risk of harm she faced during her incarceration. While Buzbee admitted that he received no training on sexual misconduct as an employee of the Jail, he indicated that he knew such conduct was improper based on "common sense." (Doc. 135-14 at 56.) For these reasons, Defendants' motion for summary judgment as to Poe and Johnson in their individual capacities is due to be GRANTED.

### c. Section 1983 Claims Against the City

The Court now turns to Bridges's § 1983 claim against Poe and Johnson in their official capacities, which the parties agree equates to a claim against the City. The actions of employees generally do not subject a municipality to liability in § 1983 actions. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Instead, municipalities may be held liable under § 1983 only when an employee's alleged violation of a person's constitutional rights

arises from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. To establish a municipality's liability under § 1983, "a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991)). "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). Thus, municipal liability may be based on: "(1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*,

30 F.3d 1332, 1343 (11th Cir. 1994). Defendants did not challenge Poe's or Johnson's status as final policymakers. (Doc. 132 at 40-43.)

Bridges's Third Amended Complaint alleges that "[t]he customs and practices allowed by Poe and Johnson violated Plaintiff s [sic] rights," so Count I of her claim is premised on the second avenue for municipal liability afforded by *Church*. (Doc. 59 at 15.) The City argues that Bridges has no basis for the allegations she makes and has established no evidence to support her claim, again pointing out that she never reported any instances of sexual abuse until she was released from the Jail. (Doc. 132 at 42-43.)

Defendants' Reply Brief supposes that the basis for Bridges's *Monell* liability claim against the City is based on the failure to train and supervise the jailers regarding sexual abuse or exploitation of female inmates. (Doc. 156 at 16.) The City agrees that sexual abuse of inmates is obviously improper, but it faults Bridges for not identifying a specific training policy or practice that the City should have instituted and contends that the obvious impropriety of sexual misconduct negates the need to train jailers on this point. (*Id.* at 15-17.)

The City points to Eleventh Circuit cases that are factually similar to the claims Bridges alleges here where the court determined that the wrong was so obvious that training was unnecessary: *Doe ex rel. Doe v. City of Demopolis*, 461 F.

App'x 915, 917 (11th Cir. 2012); *Floyd v. Waiters*, 133 F.3d 786, 796 (11th Cir.), *cert. granted, judgment vacated*, 525 U.S. 802, 119 S. Ct. 33, 142 L. Ed. 2d 25 (1998), *reinstated by* 171 F.3d 1264 (11th Cir. 1997); *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997); *Rudd v. Tatum*, No. 5:11cv373/RS/CJK, 2013 U.S. Dist. LEXIS 111167, at *26-28 (N.D. Fla. May 31, 2013). Each of these cases involved sexual misconduct, which the court determined was so obvious that a failure to train did not rise to the level of deliberate indifference. The Eleventh Circuit acknowledged, however, that while "a city may 'rely on the common sense of its [police officers] not to engage in ... criminal conduct,' ... 'a pattern of known misconduct ... may be sufficient to change reasonable reliance [on common sense] into deliberate indifference.'" *Doe ex rel. Doe*, 461 F. App'x at 917 (quoting *Floyd*, 133 F.3d at 796).

Defendants contend that no pattern of known misconduct exists in this case, so the City cannot be held liable for any alleged failures of its officers to exercise the common sense not to sexually abuse inmates. The record reveals that multiple reports were made, but none of those reports came before Bridges was released from the Jail. (Doc. 135-1 at 171-74, 194-95, 232, 268; Doc. 135-3 at 138-39; Doc. 135-16 at 44-46, 49-50, 66-68, 72, 109-10; Doc. 135-21 at 45-46; Doc. 147-3.) Thus, post-event evidence is the only kind that Bridges provides to support her claim that a policy or

custom of allowing jailers to sexually exploit inmates existed at the time of her incarceration. If true, the alleged conduct by Buzbee is reprehensible, but without more, Bridges has not provided sufficient evidence to raise a genuine issue of fact as to whether a policy or custom of inadequate training existed while she was in the Jail. Accordingly, the City's motion for summary judgment as to Count I is due to be GRANTED.

### 2.  Count II: Conspiracy

"To establish a conspiracy claim under § 1983, a plaintiff must show that "the parties 'reached an understanding' to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy." Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1122 (11th Cir. 1992) (citing Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990), cert. denied, 500 U.S. 932 (1991)). "While the plaintiffs need not produce direct evidence of a meeting of the minds, they must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective . . . ; mere speculation and conjecture will not suffice." *Puglise v. Cobb Cty., Ga.*, 4 F. Supp. 2d 1172, 1181 (N.D. Ga. 1998) (citing *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421–23 (4th Cir.1996)). Thus, the first question is whether the parties reached an understanding to deny Bridges's constitutional rights.

Defendants argue that the intracorporate conspiracy doctrine applies in this case, precluding the possibility of any agreement. (Doc. 132 at 44-45.) Under this legal doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (*en banc*). *Grider* also explained that the doctrine applies to public entities, such as municipalities and their employees, in addition to private, corporate ones. *Id.* (quoting *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001)). Defendants also contend that Bridges has provided no evidence to show the necessary element that they reached an agreement to allow the jailers to engage in sexual misconduct with female inmates. (Doc. 132 at 45-47.)

In response, Bridges makes three arguments: (1) that the Jasper Personnel Board is a separate entity, distinct from the City, so the intracorporate conspiracy doctrine does not preclude this claim; (2) the Eleventh Circuit has erred in applying the intracorporate conspiracy doctrine to cases brought pursuant to 42 U.S.C. § 1983 and § 1985(3)[7]; and (3) the evidence she has provided establishes there was a

---

[7] Bridges brings her Conspiracy claim in Count II under 42 U.S.C. § 1983. In contrast, the other plaintiffs in these consolidated cases bring their corresponding conspiracy claims under 42 U.S.C. § 1985(3).

coverup, which serves as evidence of the conspiracy. (Doc. 151-2 at 196-98.) The Court will address these arguments in turn.

First, Bridges cites no evidence that the Jasper Personnel Board is distinct from the City when she makes this claim. (Doc. 151-2 at 204.) Nor does her complaint allege that the Jasper Personnel Board conspired with Defendants in this case. (Doc. 59 at 16-18.) Furthermore, whether Bridges agrees with the holdings of the Eleventh Circuit on this issue is of no significance. While the Circuit Courts are split on the issue of whether to apply the intracorporate conspiracy doctrine to civil rights cases, the Eleventh Circuit has applied the doctrine more than once in such cases. *See Bowie v. Maddox*, 642 F.3d 1122, 1130-32 (D.C. Cir. 2011) (discussing the circuit split); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (applying the doctrine in the context of a § 1983 conspiracy claim); *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010), *aff'd*, 566 U.S. 356, (2012) (same). The law of the Eleventh Circuit is clear that the doctrine applies in this context; *Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (applying the doctrine in the context of a § 1985(3) conspiracy claim).

Even if the intracorporate conspiracy doctrine did not dispense with Bridges's conspiracy claim, the Defendants are correct that Bridges has provided no evidence of an agreement to deprive her of her constitutional rights. Bridges asserts that she

has presented evidence to show that there was a coverup, and therefore, that evidence also establishes the existence of a conspiracy. (Doc. 151-2 at 205.) Bridges points to evidence of reports by Plaintiffs, such as her conversation with Raeven Clay about what happened to her, Frank Goodson reporting his concerns to John Softley, and Monique Softley going to Johnson with reports of sexual misconduct by one of the jailers, none of which prompted any action on the part of Poe, Johnson, or the City. (Doc. 135-1 at 171-74; Doc. 147-3; Doc. 135-16 at 66-68.)

Bridges cites three cases for the proposition that evidence of a cover up can also serve as evidence of an underlying conspiracy, all from district courts in other circuits: *Carr v. Chicago*, No. 85 C 6524, 1989 U.S. Dist. LEXIS 1561, at *2 n.1 (N.D. Ill. Feb. 8, 1989); *Pedroza v. Lomas Auto Mall, Inc.*, 600 F. Supp. 2d 1162, 1170 (D.N.M. 2009); and *Henderson v. Gomez*, No. C-93-0888 MHP, 1993 U.S. Dist. LEXIS 10454, at *15-16 (N.D. Cal. July 23, 1993). Even if the Court were persuaded by this authority, the evidence Bridges has presented does not provide evidence of the agreement necessary to establish a claim for conspiracy. Accordingly, Defendants' motion for summary judgment as to Count II is due to be GRANTED.

### 3. Count IV: Negligent Hiring

Bridges's claim in Count IV of negligent hiring is against Defendant Poe in his individual capacity only. (Doc. 59 at 19.) She provides no statutory or other authority

as the basis of her claim, but she does concede in her Third Amended Complaint that "the statutory authority for hiring jailers is vested in the Jasper Personnel Board." (*Id.* at 19.) Poe, asserts that summary judgment is due to be granted on this claim because it does not exist under Alabama Law and because he is entitled to state agent and/or qualified immunity. (Doc. 132 at 53, 57-59.)

Bridges provides no argument nor cites any evidence as to how the hiring of Buzbee was negligent. (Doc. 151-2.) Even if Bridges had offered arguments or evidence on this claim, multiple courts have found that "there is no cause of action against a supervisory employee for negligent hiring under Alabama law." *Wright v. City of Ozark*, No. 1:12-CV-936-MEF, 2014 WL 1765925, at *8 (M.D. Ala. May 2, 2014) (citing *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314-15 (S.D. Ala. 2001)); *see also Cheatham v. City of Tallassee*, No. 2:11-CV-672-WHA, 2012 WL 3890127, at *13 (M.D. Ala. Sept. 7, 2012); *Grider v. City of Auburn*, 628 F. Supp. 2d 1322, 1351 (M.D. Ala. 2009), *aff'd in part, rev'd in part and remanded sub nom. Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010); *Hamilton v. City of Jackson*, 508 F. Supp. 2d 1045, 1057–58 (S.D. Ala. 2007), *aff'd sub nom. Hamilton v. City of Jackson, Alabama*, 261 F. App'x 182 (11th Cir. 2008); *Hill v. Madison Cty. Sch. Bd.*, 957 F. Supp. 2d 1320, 1342 (N.D. Ala. 2013), *aff'd in part, rev'd in part sub nom. Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015).

With no argument from Bridges to the contrary and the admission in her own complaint that the statutory authority to hire rested not with Poe but the Jasper Personnel Board, Poe's motion for summary judgment on this claim is due to be GRANTED. Because this claim fails for the reasons stated above, the Court does not address Poe's argument that he is entitled to state agent and/or qualified immunity on this claim.

### 4. Count V: Negligent Training and Supervision

In Count V, Bridges asserts that Poe, in his individual and official capacities, and Johnson, in her individual capacity only, were negligent in their duties "to train, supervise and discipline its law enforcement officers" (Doc. 59 at 20.) Again, Bridges cites no authority, statutory or otherwise, as the basis for this claim (*Id.* at 20-21.) Defendants argue that (1) the claim against the City is barred by the statute of nonclaim in Ala. Code § 11-47-23; (2) a claim for negligent training and supervision does not exist against a municipality or supervisory employee under Alabama law; (3) even if a cause of action exists, Bridges has not provided any evidence that Johnson or Poe had constructive knowledge of prior sexual misconduct by Buzbee; and (4) Poe and Johnson are entitled to state agent/qualified immunity in their individual capacities. (Doc. 132 at 53-59.) The only arguments Bridges appears to make in Plaintiffs' Amended Consolidated Response Brief pertain to

liability for failure to train under § 1983. (Doc. 151-2 at 192-200.) The Court has already addressed these arguments in Section III.B.1.c. and found that summary judgment on Bridges's claim against the City for its failure to train under § 1983 is due to be GRANTED.

To the extent that Bridges raises a separate claim for negligent training and supervision under state law in Count V, the City argues that Ala. Code § 11-47-23 bars Bridges's claim for negligent training and supervision against it. The statute states in relevant part that "[c]laims for damages growing out of torts shall be presented [to the clerk] within six months from the accrual thereof or shall be barred." Ala. Code § 11-47-23. Section 11-47-23 is a statute of nonclaim, providing a broader defense than a statute of limitations by extinguishing debts and liabilities in addition to barring remedies. *Boyle v. Pell City*, 866 F.3d 1280, 1287 (11th Cir. 2017). It can be satisfied by filing a complaint or presenting the claim to the clerk as stated in the statute. *Id.* Bridges was released from the Jail in May 2017. (Doc. 135-1 at 153.) Bridges filed her complaint in this case on April 4, 2019, and Kathy Chambless, the City Clerk for the City of Jasper whose job responsibilities include receiving Notices of Claim, provided an affidavit stating that none of the plaintiffs in this case filed a Notice of Claim at any time with the City. (Doc. 1 and Doc. 135-25.) Because Bridges failed to comply with the requirements of Ala. Code § 11-47-23, her claim is barred,

and the City's motion for summary judgment is due to be GRANTED on this claim.

Poe, Johnson, and the City also contend that a claim for negligent training and supervision, much like Bridges's claim in Count IV for negligent hiring against Poe, does not exist under Alabama law. (Doc. 132 at 54-57.) Federal Courts have consistently found that "a claim against a municipality for a supervisor's negligent hiring or training is not cognizable under Alabama law." *Doe v. City of Demopolis*, 799 F. Supp. 2d 1300, 1310 (S.D. Ala. 2011), *aff'd sub nom. Doe ex rel. Doe v. City of Demopolis*, 461 F. App'x 915 (11th Cir. 2012); *see also Hamilton v. City of Jackson*, 508 F. Supp. 2d 1045, 1057–58 (S.D. Ala. 2007), *aff'd sub nom. Hamilton v. City of Jackson, Alabama*, 261 F. App'x 182 (11th Cir. 2008).

In *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 13014 (S.D. Ala. 2001), the court explained that municipal liability under Ala. Code § 11-47-190 is based on the doctrine of respondeat superior, which requires the employee to be liable for a tort for the employer to be subject to liability. Alabama tort law for negligent supervision and training requires a showing of a master-servant relationship, but a supervisor is not the master of a fellow employee, even though the fellow employee has a subordinate role, because the status of "master" in the master-servant relationship is reserved for the actual employer. *Id.* at 1315 (citing *Tyson Foods, Inc. v. Stevens*, 783 So.2d 804, 807-08 (Ala. 2000)). Furthermore, the court in *Ott* found no authority

supporting a claim for negligent training or supervision of a supervisory employee under Alabama law. *Id.* at 1314. *See also* Hill v. Madison Cty. Sch. Bd., 957 F. Supp. 2d 1320, 1342 (N.D. Ala. 2013), aff'd in part, rev'd in part sub nom. *Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015) ("Under Alabama law, the tort theory of negligent hiring, retention, training, or supervision lies only against the employer of an 'incompetent' employee, not the co-employees or even supervisors of the 'incompetent' employee.")

Because Alabama law does not recognize the tort of negligent training or supervision for a supervisory employee, summary judgment is due to be GRANTED on the claims against Poe and Johnson in their individual capacities. Furthermore, without liability for the supervisory employees, the municipality cannot be held liable under a theory of respondeat superior as required by Ala. Code § 11-47-190. Accordingly, no claim exists under Alabama law against the City for negligent training or supervision, so even if the statute of nonclaim did not apply in this case, summary judgment is due to be GRANTED in favor of the City for this reason as well.

Because summary judgment is due to be granted on this claim for the reasons stated above, the Court declines to address Defendants additional arguments about the evidence presented by Bridges and state agent and/or qualified immunity for Poe

and Johnson in their individual capacities.

### 5. Count VII: Outrage

Plaintiff concedes that her claim for outrage is due to be dismissed. (Doc. 151-2 at 186.) Accordingly, summary judgment is due to be GRANTED on this claim.

### 6. Count VIII: Sex Trafficking

In Count VIII, Bridges brings a claim against Poe, in his official and individual capacities, and against Johnson, without specifying what capacity she is sued in, for violation of 18 U.S.C. § 1591, known as the Trafficking Victims Protection Act ("TVPA"). In Plaintiffs' Amended Consolidated Response Brief, though, they concede that "neither Poe nor Johnson, in their individual capacities, are liable under the TVPA. However, in their official capacities, Poe and Johnson can be held liable." (Doc. 151-2 at 207.) Accordingly, summary judgment is due to be GRANTED as to Bridges's claims in Count VIII as to Poe and Johnson in their individual capacities. The Court will now consider the remaining claim against the City.

The TVPA confers criminal and civil liability upon "whoever knowingly . . . entices, harbors, transports, provides, obtains, or maintains by any means a person" with the knowledge that "means of force, threats of force, fraud, [or] coercion" would be employed to "cause the person to engage in a commercial sex act." 18 U.S.C. §§ 1591(a), 1595. It also establishes civil "venture liability" for anyone who

"knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter . . . ." 18 U.S.C. § 1595(a). In a recent decision, the Eleventh Circuit elaborated on the elements of a claim under the TVPA for beneficiary liability, stating that a plaintiff must show that the defendant:

> (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021).

Thus, for Bridges's claim of venture liability to survive Defendants' motion for summary judgment she must show that the City (1) knowingly benefitted (2) from participation in the alleged venture, (3) which violated the TVPA as to Bridges, and (4) knew or should have known of the venture's violation of § 1591. Even if Buzbee's alleged sexual abuse of Bridges constituted an undertaking by the City that violated the TVPA, the City's motion for summary judgment is due to be GRANTED because Bridges is unable to establish the other elements of her claim as explained below.

### a.  Knowingly Benefit

In discussing this first element of the venture liability claim in *Doe #1 v. Red*

*Roof Inns, Inc.*, the Eleventh Circuit recited the Black's Law Dictionary definition for "knowledge": "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." 21 F.4h 714 at 723-24 (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). The court also noted that § 1595(a) provides an explanation for the term benefit with the description "financially or by receiving anything of value." *Id.*

The court in *Red Roof Inns* found no need to explain further because the parties did not dispute this element. *Id.* at 723-24. A district court in Georgia also applied the standard set forth by the Eleventh Circuit in *Red Roof Inns*, and as the Eleventh Circuit, "ha[d] no trouble concluding that Defendants 'knowingly benefited' from any potential sex trafficking venture in which they allegedly participated." *A.B. v. H.K. Grp. of Co.*, No. 1:21-CV-1344-TCB, 2022 WL 467786, at *4 (N.D. Ga. Feb. 9, 2022) The district court stated that if it found that the defendants participated in a venture that violated the TVPA, knowing that the venture did so, it "would have no difficulty finding that the money Defendants received from room rentals constituted a benefit, knowingly received." *Id.*

Bridges asserts that the City profited from the alleged arrangement the jailers had with inmates to exchange sex for trustee status because of the labor the inmates performed. (Doc. 151-2 at 206.) Furthermore, she contends that "Jasper actually

knew that Jasper was benefitting from their work." (*Id.* at 207.) Jailer Jonathon Long

testified that female inmates would do laundry, cook, and clean. (Doc. 135-22 at 70-

71.) Poe and Johnson were both aware that trustees performed this work. (Doc. 135-

9 at 144; Doc. 135-13 at 85.) Furthermore, Bridges cites to Poe's deposition

testimony that at one point there was a "shortage of inmates that could be used to

go out," and during that time "the City hired some employees to do that, some labor

people." (Doc 135-9 at 147-48.) The inmates working as trustees thus provided a

financial benefit to the City in terms of the costs it saved in employing workers to

perform the jobs that trustees do in a way that is analogous to the profits from the

rental of hotel rooms in *Red Roof Inns*.

Still, the trustee program did not exist for the purpose of allowing jailers to

have sex with inmates, and Plaintiffs do not allege that all trustees were subjected to

sexual misconduct by Buzbee or Boyd. In fact, not all of the Plaintiffs served as

trustees during their incarceration at the Jail. Bridges served as a trustee, which

provided Buzbee with opportunities to be alone with her in secluded areas of the Jail,

but the City did not make Bridges a trustee in order that Buzbee might exploit her.

Any benefits the City received from Bridges's work as a trustee are unrelated to

Buzbee's alleged misconduct. Therefore, the City did not knowingly benefit from

the alleged venture, and summary judgment in favor of the City is due to be

GRANTED as to Count VIII.

### b. Participation in a Venture

Even if Bridges could establish the first element, her claim in Count VIII would fail because the City did not participate in the venture. The Eleventh Circuit devoted much of its analysis in *Doe #1 v. Red Roof Inns* to the issue of participation in a venture. The court declined to use the definition for "participation in a venture" provided under § 1591(e)(4) because § 1591 explicitly stated that the definitions only applied as used in that section and because the definition did not make sense when read in the context of § 1595. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). Instead, the court adopted the plain meaning based on dictionary definition of the terms and concluded that "participation in a venture" means "[taking] part in a common undertaking or enterprise involving risk and potential profit." *Id.* at 725.

The court ultimately held that the plaintiffs did not allege sufficient facts to survive a motion to dismiss on this element. *Id.* at 727. It stated that the plaintiffs' allegations regarding the franchisors' knowledge and participation in the venture was limited to "sen[ding] inspectors to the hotels who would have seen signs of sex trafficking and … receiv[ing] reviews mentioning sex work occurring at the hotels." *Id.* The court determined this did not reach the level of participation, explaining that

"observing something is not the same as participating in it." *Id.*

The situation in *Red Roof Inns*, however, differs from this case in one important respect. Unlike the franchisors in that case, the officials in the Jail had an "affirmative duty under the Constitution to provide for the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 852 (1994) (Blackmun, J., concurring). When an individual has a duty, an act *or omission* can result in liability. *See, e.g.*, 28 U.S.C. § 2674. To the extent that Jail administrators knew of the alleged arrangement between the jailers and the inmates, their nonaction could raise a question of material fact as to whether that nonaction rose to a level of participation by effectively allowing the alleged behavior to continue. This Court cannot say that a knowing failure to act in accordance with an affirmative duty does not rise to the level of participation in a venture.

Bridges, however, has provided no evidence sufficient to raise a material question of fact on this element because there is no indication that the City knew about Buzbee's alleged misconduct during her incarceration. Without evidence that the City knew of the alleged venture, Bridges cannot prove that it participated in the venture.

### c. Knowledge

The final element in establishing a venture liability claim under the TVPA is "knowledge." According to § 1595(a), the defendant is liable if it "knew or should have known" the venture "engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). In *Red Roof Inns*, the Eleventh Circuit relied on definitions from Black's Law Dictionary for "knowledge" and "constructive knowledge" to determine what is required to satisfy this element. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021). "Knowledge" is defined as "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." *Knowledge*, Black's Law Dictionary (11th ed. 2019). "Constructive knowledge," however, means "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019).

As already discussed above, Bridges has provided no evidence that the City knew of the alleged misconduct perpetrated by Buzbee. The question of whether the City should have known about the alleged venture is a closer question, but because Bridges was unable to establish that the City knowingly benefitted or participated in the alleged venture, the City's constructive knowledge would not save her claim.

Because Bridges has failed to raise a genuine issue of material fact on two elements of her TVPA claim, the City's motion for summary judgment on Count VIII is due to be GRANTED.

### 7.  Standing for Injunctive Relief

Bridges's Third Amended Complaint seeks injunctive relief against Poe, Johnson, Buzbee, and those acting in concert with them, "requiring them to exercise diligence in hiring practices and to properly train, supervise, and discipline their jailers, as well as to operate the Jail in a manner reasonably calculated to promote the safety of the women incarcerated there." (Bridges Doc. 59 at 29.) The Court has already determined that it has no jurisdiction over Defendant Buzbee and will therefore not consider Bridges's request for injunctive relief against him.

Defendants argue that Bridges lacks standing to pursue injunctive relief. (Doc. 132 at 60.) To have standing, Bridges "must demonstrate a 'personal stake in the outcome." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)) (internal brackets and ellipsis omitted). In *Lyons*, the Supreme Court also referenced *Rizzo v. Goode*, 423 U.S. 362 (1976), in which it

determined that a claim, which was based on "'relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief." *Lyons*, 461 U.S. at 103-104 (citing *Rizzo v. Goode*, 423 U.S. 362 at 372). Aside from the fact that this Court has already determined that Defendants' motion for summary judgment on Bridges's § 1983 claims should be granted in Section III.B.1 above, Bridges cannot show a present or ongoing violation to establish standing for injunctive relief.

Furthermore, "in a suit brought in the plaintiff's individual capacity, injunctive relief benefiting nonparties is not required if it in no way relates to the vindication of the plaintiff's rights." *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1527 (11th Cir. 1984). Bridges has not shown how injunctive relief would vindicate her rights, so she is not entitled to injunctive relief on behalf of present or future inmates.

For the reasons set forth above, Defendants' motion for summary judgment as to Bridges's plea for injunctive relief is also due to be GRANTED.

### C. Claims by Plaintiffs Charity Tessener, Jessica Rainer, Whitley Goodson, Megan Dunn, and Allison Mann

The Court turns now to claims by the remaining Plaintiffs. As noted above, the Court will analyze these claims together because of the similar nature of each of the claims, but the Court will address any issues that warrant separate treatment as necessary.

### 1.  Time Bar as to Plaintiffs Jessica Rainer and Allison Mann

The Court must first address Defendants' affirmative defense against Plaintiffs Rainer and Mann, arguing that summary judgment is due to be granted on the federal claims they raise in Counts I, II, III, IV, VI, and VIII, as well as their state law claims in Counts V and XI, as time barred. (Rainer Doc. 120 at 25-31; Mann Doc. 109 at 22-27.)

Rainer's last day of incarceration in the Jail was August 24, 2017.[8] (Bridges Doc. 135-4 at 106.) She filed her complaint on August 26, 2019. (Rainer Doc. 1.) Mann was incarcerated in the Jail from August 2, 2017, to November 9, 2017, and she filed her complaint on December 2, 2019. (Bridges Doc. 135-8 at 52-54; Mann Doc. 1.) Both Rainer and Mann thus filed their complaints over two years after their release from the Jail.

### a.  Federal Claims in Counts I, II, III, and IV

The claims in Counts I, III, and IV in Mann's Complaint and Rainer's First Amended Complaint are brought under 42 U.S.C. § 1983, and the claims in Count II in these respective documents are brought under 42 U.S.C. § 1985. (Mann Doc. 1 at 29-38; Rainer Doc. 7 at 30-39.) "As to the claims brought here under 42 U.S.C.

---

[8] According to Rainer, the last time incident of any sexual contact with Boyd was on August 22, 2017. (Doc. 135-4 at 106.)

§§ 1983 and 1985, precedent is clear that these are measured by the personal injury limitations period of the state." *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996). In Alabama, the statute of limitations for personal injury claims is two years. Ala. Code § 6-2-38(*l*).

Plaintiffs Rainer and Mann argue that the Williams-Coleman Act of Alabama, which criminalizes human trafficking, governs when the cause of action accrues and provides the applicable statute of limitations and tolling provision for their claims. Ala. Code § 13A-6-151 et seq. (Bridges Doc. 151-2 at 185-86.) The Williams-Coleman Act provides a civil cause of action for victims and imposes a five-year statute of limitations for those civil actions. Ala. Code §§ 13A-6-157, -158(b). Plaintiffs Rainer and Mann contend that the statute of limitations applies to "an action for an offense defined by this article" regardless of whether the action is brought under the article. Ala. Code § 13A-6-158(a). (*Id.*) They also point to the tolling provision in Alabama Code § 13A-6-158(a)(3), which suspends the running of the statute of limitation while the person entitled to bring a claim "could not have reasonably discovered the crime due to circumstances resulting from the human trafficking situation, such as psychological trauma, cultural and linguistic isolation, and the inability to access services." (*Id.*)

Defendants counter that Rusty Boyd was not charged for any crime under

Alabama Code § 13A-6-152 for human trafficking; nor did Rainer or Mann bring any of their civil claims under the Williams-Coleman Act. (Bridges Doc. 142 at 12-13.) Instead, they brought their trafficking claims under the TVPA, 18 U.S.C. § 1595, which Defendants concede are subject to a ten-year statute of limitations and would not be barred by the statute of limitations. (Rainer Doc. 120 at 26 n.3; Mann Doc. 109 at 23 n.3.) The §§ 1983 and 1985 claims at issue here allege unlawful detention and cruel and unusual punishment (Count I), conspiracy (Count II), negligent hiring and supervision (Count III), and negligent training (Count IV). (Rainer Doc. 7 at 30-39; Mann Doc. 1 at 29-38.)

The statute of limitations for the Williams-Coleman Act does not apply to the §§ 1983 and 1985 claims brought by Rainer and Mann. The Alabama statute of limitations for personal injury claims applies in this context, and it bars claims brought after two years. Rainer and Mann both filed their respective complaints over two years after their claims accrued, and therefore, these claims are barred by the statute of limitations. Defendants' motion for summary judgment on Counts I, II, III, and IV as to Rainer and Mann is therefore due to be GRANTED.

### b. Claims in Count VIII premised on the conspiracy alleged in Count II

Defendants assert that to the extent Rainer's and Mann's claims for negligent failure to prevent a conspiracy in Count VIII are based on the conspiracy they allege

in Count II of their complaints, the one-year statute of limitations for claims brought under 42 U.S.C. § 1986 bars their claims. The conspiracy alleged in Count II is based on events that transpired while the plaintiffs were incarcerated in the Jail. The events that form the basis of the conspiracy they allege in Count VII of their complaints, however, occurred after they were released and much closer in time to the filing of their complaints.

In Plaintiffs' Amended Consolidated Response Brief, Rainer concedes that her claim in Count VIII for Negligent Failure to Prevent a Conspiracy under 42 U.S.C. § 1986 is barred by a one-year statute of limitations. (Bridges Doc. 151-2 at 186.) The express terms of § 1986 state that "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." To the extent Rainer's claims in Count VIII are based on the conspiracy alleged in Count II, Defendants' motion for summary judgment as to Count VIII is due to be GRANTED.

Plaintiffs offer no argument as to why Mann's claim in Count VIII would not also be barred for the same reason. As discussed in III.C.1.a., Mann's claims in Count II of her complaint were barred by the two-year statute of limitations. Because the same time periods are relevant here insofar as Count VIII is premised on the conspiracy alleged in Count II and because the statute of limitations is shorter under

§ 1986, the statute of limitations will bar Mann's claim here as well. Therefore, Defendants' motion for summary judgment as to Mann's claims in Count VIII, to the extent they are premised on the conspiracy alleged in Count II, is due to be GRANTED.

### c. State Law Claims in Counts V and XI

In Counts V and XI, Rainer and Mann assert claims based on Alabama state law for outrage and negligence, respectively. (Rainer Doc. 7 at 39-40, 48-49; Mann Doc. 1 at 38-40, 47-48.) As with their federal claims based on §§ 1983 and 1985, these state law claims have a two-year statute of limitations under Alabama Code § 6-2-38(*l*). *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993) ("The statutory period of limitations for negligence … actions, found at Ala.Code 1975, § 6–2–38, is two years from the date the injury occurred."); *Archie v. Enter. Hosp. & Nursing Home*, 508 So. 2d 693, 695 (Ala. 1987) ("[T]he tort of outrage or intentional infliction of emotional distress is governed by the two-year statute of limitations found in § 6–2–38(*l*)…").

Again, these claims are premised on events that occurred while Plaintiffs Rainer and Mann were incarcerated in the Jail, and because they filed their actions over two years after their release, their claims under Counts V and XI are also barred by the statute of limitations. Accordingly, Defendants' motion for summary

judgment as to the claims Rainer and Mann raise in Counts V and XI are due to be GRANTED.

### d.  Count XI Statute of Nonclaim

Defendants assert that the statute of nonclaim bars the claims in Count XI of all Plaintiffs. (Tessener Doc. 140 at 65-66; Rainer Doc. 119 at 29-31, 69; Goodson Doc. 115 at 61; Dunn Doc. 60; Mann Doc. 108 at 26-27, 67.) Therefore, the Court will address this argument as it pertains to all Plaintiffs in its discussion of Count XI below.

### 2.   Claims Under § 1983

The Court now turns to the claims of all remaining Plaintiffs asserted under 42 U.S.C. § 1983.

### a.  Qualified Immunity

As an initial matter, the Court must first address the complete defense of qualified immunity asserted by Poe and Johnson in their individual capacities as to the claims raised under § 1983 in Counts I, III, and IV.

"The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). "Qualified immunity offers complete protection for government officials

sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity analysis does not take into account an officer's alleged subjective intent; instead, it "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Thus, to overcome a public official's entitlement to qualified immunity, a plaintiff must be able to establish not only that the public official acted wrongfully, but also be able to point the court to law existing at the time of the alleged violation that provided "fair warning" that the conduct of the defendants was illegal. *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003).

To be eligible for qualified immunity, the officers must demonstrate that they were acting in the scope of their discretionary authority. *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004). "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citing *Holloman ex rel. Holloman v.*

*Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)). "[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." *Godby v. Montgomery County Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999). Plaintiffs concede that Poe and Johnson were acting in their discretionary authority. (Doc. 151-2 at 203.)

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "First, the plaintiff must establish that the defendant violated a constitutional right. Then, the plaintiff must show that the violation was clearly established." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). Courts can consider these prongs in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

### i.  Clearly Established

To demonstrate that a right is "clearly established," a plaintiff may point to a "materially similar case," identify a "broader, clearly established principle," or

show that "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018) (citation and internal quotation marks omitted); *see also Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013). In considering whether a violation is "clearly established," relevant law "consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). A materially similar case "need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *J W by & through Tammy Williams*, 904 F.3d at 1259 (citation and internal quotation marks omitted).

In their § 1983 claims, Plaintiffs assert that Poe and Johnson were deliberately indifferent by "allow[ing] a custom and practice to develop at the Jail arising to an official policy, thereby authorizing male jailers … to coerce prisoners … [to] engage in sexual activities with the jailers [and] suffer a loss of privacy …." (Tessener Doc. 39 at 36; Rainer Doc. 7 at 30; Goodson Doc. 1 at 35; Dunn Doc. 7 at 30; Mann Doc. 1 at 30.) They also alleged that Defendants were deliberately indifferent to the rights of Plaintiffs by failing "to conduct such due diligence as was necessary to ensure that law enforcement officers and their supervisors employed … to serve as jailers in [the] Jail, were suitably prepared through education, training, experience, and

temperament to protect the rights of the inmates they guarded." (Tessener Doc. 39 at 40; Rainer Doc. 7 at 35; Goodson Doc. 1 at 39; Dunn Doc. 7 at 34; Mann Doc. 1 at 34.) Furthermore, Plaintiffs contend that Defendants were deliberately indifferent for their failure to train the jailers under their supervision. (Tessener Doc. 39 at 42-44; Rainer Doc. 7 at 37-39; Goodson Doc. 1 at 41-43; Dunn Doc. 7 at 36-38; Mann Doc. 1 at 36-38.)

Defendants acknowledge that well-established precedent mandates that prison officials must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). (Tessener Doc. 162 at 24; Rainer Doc. 142 at 26; Goodson Doc. 138 at 24; Dunn Doc. 139 at 24; Mann Doc. 131 at 25-26.) Therefore, there is not a dispute as to this first element.

### ii.  Violation of a Constitutional Right

While it is well established that prison officials "must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, (1984)). Not every injury "translates into constitutional liability." *Id.* at 834. Instead, the Eighth Amendment is only implicated when government officials are deliberately indifferent to a substantial risk of serious harm.

*Id.* This analysis is a three-fold inquiry, considering: (1) the subjective knowledge of the actor, (2) that was disregarded, and (3) conduct that is more than gross negligence. *Id.* at 272.

Poe and Johnson are supervisors, and "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003). Thus, to hold a supervisor liable for constitutional violations, a plaintiff must show that either (1) the supervisor directly participated in the unconstitutional conduct or (2) a "causal connection" exists between the supervisor's actions and the constitutional violation alleged. *Id.* Plaintiffs do not allege direct participation by Poe or Johnson. Thus, this Court need only consider whether Plaintiffs have provided evidence to raise a question of material fact as to a causal connection between the actions of Poe and Johnson and the constitutional violations alleged.

A causal connection can be established when: (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "a supervisor's custom or policy results in deliberate indifference to constitutional rights"; or (3) "facts support an inference

that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1048 (11th Cir. 2014) (internal quotation marks omitted) (alterations accepted); *accord Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) (per curium). The conduct at issue must be "obvious, flagrant, rampant, and of continued duration." *Id*. Put simply, the standard for holding supervisors liable in their individual capacities for the actions of their subordinates is "extremely rigorous." *Id*.

Plaintiffs base their argument against qualified immunity on the second avenue outlined in *Keith*, asserting that Poe and Johnson had a custom or policy resulting in deliberate indifference to Plaintiffs' constitutional rights. (Bridges Doc. 151-2 at 202-04.) As discussed earlier, "[d]eliberate indifference requires the following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331–32 (11th Cir.2013)). "[A] policy or custom … can be either a written custom or policy, such as an ordinance, or an unwritten practice that is so widespread and 'so permanent and well settled as to constitute a custom or use with the force of law.'"

*Flowers v. Patrick*, 869 F. Supp. 2d 1331, 1335 (M.D. Ala. 2012) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)).

In order to establish that Defendants had a custom of allowing jailers to take advantage of inmates, Plaintiffs must show that Poe and Johnson were aware of the alleged misconduct and allowed it to continue. As will be discussed in more detail below, most of the reports that reached Poe or Johnson occurred during Tessener's incarceration, and Tessener was the last of the Plaintiffs to be released from the Jail. Recognizing this hurdle to their claims, Plaintiffs point to Eleventh Circuit precedent acknowledging that

> "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod,* 871 F.2d 1151, 1167 (1st Cir.1989). But "[t]he inferences to be made from these [post-event] facts merely lend weight" to a finding that there was a policy "behind the actions which led to" the constitutional violation. *Kibbe v. City of Springfield,* 777 F.2d 801, 809 (1st Cir.1985). Again, no party contests that a "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct." *Thomas* [*ex rel. Thomas v. Roberts*]*,* 261 F.3d [1160,] 1174 n. 12. But an isolated incident is, by definition, not a "persistent failure." *Id.*

*Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015). (Doc. 151-2 at 191.) Defendants contend that *Salvato* is distinguishable because the post-event incidents were reported or documented in that case. (Doc. 156 at 13-14 n.1.)

The record reveals that multiple reports were made. While Bridges admits

that she only told a fellow inmate in confidence during her stay in the jail (Doc 135-1 at 194-95), she asserts that Johnson admonished and punished inmates for making even minor reports, such as requests for toilet paper or feminine hygiene products, on the available kiosk system because they were "making her look bad." (Doc. 135-1 at 161-62.) Plaintiffs Bridges and Tessener also testified that they were afraid to submit reports over the jail phone or through the kiosk system because they were concerned about who would have access to these messages. (*Id.* at 284-85; Doc. 135-3 at 142-43.) Bridges did report to Clay inappropriate interactions with Boyd and Buzbee the day she was released from jail, but Bridges asked Clay to keep the information between them. (Doc. 135-1 at 171-74.) Bridges also confided in Poe's nephew, Brett Calvert, but she never asked him not to tell anyone about what happened. (*Id.* at 232, 268.)

Monique Softley testified that in November of 2017 she received a report of Jailer Jonathon Long having sex with Plaintiff Charity Tessener from Charlie Nalls, a male inmate, and that she "specifically took that information, went back inside the jail and reported it to Sergeant Johnson, logged it in [the jail] log book word for word everything that he told [her]." (Doc. 135-16 at 66-68.) However, Softley testified that Johnson responded by saying, "I told John he is going to get caught doing the things that he is doing," suggesting she was already aware of Long's behavior and had not

taken any formal disciplinary action against him. (Doc. 135-16 at 72.) When Softley told Johnson to "make sure that you report this to Lieutenant Mize or either Chief Poe," Softley testified that Johnson responded with "um." (*Id.*) When Johnson was asked about this report, Johnson said she "forgot all about it," even though she testified that she "would have taken it very seriously." (Doc. 135-13 at 123-26.)

Plaintiff Charity Tessener also testified that she wrote a letter to Poe, explaining that she "didn't like the way that Rusty would do things down there or the way things were going" and "to come talk to [her]." (Doc. 135-3 at 138-39.) She asked Monique Softley to deliver the letter (*id.*), and Softley described delivering letters on behalf of several female inmates, including Plaintiffs Tessener, Mann, and Goodson, to Poe, though she had no knowledge of the content of the letters (doc. 135-16 at 44-46, 49-50, 109-10). Softley also stated that "a lot of the things [the inmates] would tell Sergeant Johnson, she wouldn't act on it and then I would take it to Lieutenant Mize. At the time he wouldn't act on it." (*Id.* at 45.) She also recalled that the request to deliver the letters arose as a result of concerns from the inmates who used the kiosks to report grievances, stating, "[T]hey wasn't getting a response and they didn't know if somebody was going in taking their grievances out and they wanted to make sure Chief Poe got their complaints." (*Id.* at 110.)

Clay also shared an occasion in which Tessener confided in her about an

incident with Rusty Boyd. (Doc. 135-21 at 45-46.) Clay testified that Tessener was visibly upset when she picked her up from the animal shelter and that when she asked Tessener what was going on, Tessener said she did not want to get Clay involved. (*Id.* at 46.) When Clay probed further, Tessener told her that Rusty Boyd had made her get in a closet with him and ejaculated in front of her before making her clean it up with a towel. (*Id.*) Tessener also told Clay that she had kept the towel. (*Id.*) However, because Tessener claimed to have already reported the incident to someone unknown to Clay, Clay did not report it herself. (*Id.*)

Furthermore, Frank Goodson, the husband of Plaintiff Whitley Goodson, provided an affidavit that states that he "reported [his] suspicions [that his wife had been the victim of sexual exploitation] to John Softley, an investigator formerly assigned to the office of the district attorney in Walker County, [who was then] employed by the City of Jasper." (Doc. 147-3.) Mr. Goodson added that Poe requested to meet with him, but he declined that invitation. (*Id.*)

The Plaintiffs in this case have provided evidence that they made multiple attempts to alert officials to the issues they were facing within the jail, but nearly all of the reports that reached Johnson and Poe were made by Tessener, who was the last of the Plaintiffs to be released from the Jail, or the reports were made during Tessener's incarceration. This evidence is well beyond the "isolated incident" that

*Salvato* warned against when considering post-event evidence. However, Plaintiffs have not established that Poe and Johnson had subjective knowledge of a substantial risk of serious harm to the Plaintiffs early enough to raise a question of fact as to whether a practice of disregarding sexual misconduct by jailers was "so widespread and 'so permanent and well settled'" that it amounted to a custom in the Jail. *Flowers*, 869 F. Supp. 2d at 1335 (quoting *Praprotnik*, 485 U.S. at 127).

As with Bridges, the conduct that Tessener, Rainer, Goodson, Dunn, and Mann allege they endured from Boyd is atrocious. However, Plaintiffs have failed to establish that Poe and Johnson violated their constitutional rights by knowingly allowing such misconduct, and therefore, Poe and Johnson are entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment as to Poe and Johnson on Plaintiffs' § 1983 claims are due to be GRANTED.

### b. Count I: Unlawful Detention and Cruel and Unusual Punishment

The Court will now address the substance of Plaintiffs' § 1983 claim in Count I for unlawful detention and cruel and unusual punishment as to the City because the affirmative defense of "qualified immunity is not available to municipalities." *Hartwell v. City of Montgomery, AL*, 487 F. Supp. 2d 1313, 1328 (M.D. Ala. 2007) (citing *Owen v. City of Independence,* 445 U.S. 622, 638 (1980); *Moore v. Morgan,* 922 F.2d 1553, 1556 (11th Cir. 1991)).

### i.  Fourth Amendment

Defendants make the same argument in their briefs addressing claims by the remaining Plaintiffs as they do in their brief addressing Plaintiff Stacey Bridges's Fourth Amendment claim under § 1983. For the same reasons the Court articulated in its discussion of Bridges's Fourth Amendment claim, the Court also finds that the City's motion for summary judgment on the remaining Plaintiffs' Fourth Amendment claims is due to be GRANTED.

### ii.  Eighth Amendment

The actions of employees generally do not subject a municipality to liability in § 1983 actions. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Instead, municipalities may be held liable under § 1983 only when an employee's alleged violation of a person's constitutional rights arises from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

To establish a municipality's liability under § 1983, "a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3)

that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Plaintiffs allege that "[t]he customs and practices of the City violated Plaintiff's rights," so Count I of their claims are premised on the second avenue for municipal liability afforded by *Church*. (Tessener Doc. 39 at 37; Rainer Doc. 7 at 31; Goodson Doc. 1 at 36; Dunn Doc. 7 at 31; Mann Doc. 1 at 31.) As the Court has already discussed in its analysis of Poe's and Johnson's qualified immunity defense, Plaintiffs have failed to establish that the City had a custom of disregarding jailer misconduct. For the same reasons, their Eighth Amendment claim against the City fails, and the City's motion for summary judgment on Count I is due to be GRANTED.

### c. Count III: Negligent Hiring and Supervision

In Count III of their respective complaints, Plaintiffs sue Poe in his individual and official capacities, alleging that he failed to exercise due diligence in executing his duty to the plaintiffs to ensure that the officers he hired were "suitably prepared… to protect the rights of the inmates they guarded." (Tessener Doc. 39 at 40; Rainer Doc. 7 at 35; Goodson Doc. 1 at 39; Dunn Doc. 7 at 34; Mann Doc. 1 at 34.) Defendants cite Supreme Court authority noting the stringent standard that must be applied in such cases:

Where a plaintiff presents a § 1983 claim premised upon the inadequacy of an official's review of a prospective applicant's record, however, there is a particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself. Every injury suffered at the hands of a municipal employee can be traced to a hiring decision in a "but-for" sense[.]… To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). The Court further explained that

[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Id.* at 411.

In Plaintiffs' Amended Consolidated Response Brief, they point to a response on Boyd's application as evidence that his pre-employment history raised red flags about his cruelty to women. (Bridges Doc. 151-2 at 195-96.) Explaining his "yes" response to the question of whether he had ever filed for bankruptcy, Boyd stated that he "went through [a] divorce," and filing for bankruptcy was the "only way [he] could get [his ex-wife] back in [a] courtroom." (Bridges Doc. 147-1 at 77.) Plaintiffs assert that this explanation amounts to Boyd "bragg[ing] on his employment

application that he had abused legal process to vex his former wife." (Bridges Doc. 151-2 at 195.)

This evidence fails to meet the rigorous standard set by the Supreme Court in *Bryan Cnty.* Plaintiffs' interpretation that Boyd was bragging about abusing the legal process to harass a woman is speculation unsupported by any other evidence, and without more, it does not create a question of fact as to whether the "plainly obvious consequence" of hiring Boyd would be the deprivation of Plaintiff's constitutional rights. Accordingly, Defendants' motion for summary judgment as to Count III is due to be GRANTED.

### d. Count IV: Negligent Training

The Court has already addressed allegations of negligent training with regard to Plaintiff Bridges's § 1983 claims against the City in Section III.B.4 above. For the same reasons, that the Court found Defendants' motion for summary judgment was due to be granted in that case, Defendants' motion for summary judgment as to the remaining Plaintiffs' claims for negligent training is also due to be GRANTED.

### 3. Count II: Conspiracy

In contrast to Plaintiff Bridges, the remaining Plaintiffs brought their conspiracy claims in Count II under 42 U.S.C. § 1985(3). Plaintiffs concede that Poe and Johnson are entitled to qualified immunity under *Ziglar v. Abbasi*, 137 S. Ct. 1843

(2017) for their claims brought pursuant to 42 U.S.C. § 1985(3). (Bridges Doc. 151-2 at 204.) Therefore, Defendants' motion for summary judgment on Count II of the remaining Plaintiffs' claims as to Poe and Johnson is due to be GRANTED.

In regard to the City, Plaintiffs assert the same arguments as those raised in relation to Bridges's conspiracy claim: (1) that the Jasper Personnel Board is a separate entity with which the City could conspire, undermining Defendants' argument that the intracorporate conspiracy doctrine bars this claim; (2) that the Eleventh Circuit erred in applying the intracorporate conspiracy doctrine to civil rights claims; and (3) that they have provided evidence of a coverup, which serves as evidence of a conspiracy. (Bridges Doc. 151-2 at 204-05.) For the same reasons those arguments were unavailing with regard to Bridges's claim, they are also ineffective here. Defendants' motion for summary judgment as to the City on Count II is likewise due to be GRANTED.

### 4.    Count V: Outrage

The Court now turns to Plaintiffs' state law claim in Count V for outrage. The Court will first address the claim by Plaintiff Mann and then the claims by Plaintiffs Tessener, Rainer, Goodson, and Dunn.

### a.  Plaintiff Mann

Like Plaintiff Bridges, Plaintiff Mann concedes that her claim in Count V for

outrage is due to be dismissed (doc. 151-2 at 186), so summary judgment is due to be GRANTED on her claim in Count V.

### b. Plaintiffs Tessener, Rainer, Goodson, and Dunn

In Plaintiffs' Amended Consolidated Response Brief, Bridges and Mann conceded that their claims for outrage were due to be dismissed without any explanation or argument as to why the same is not true for the remaining Plaintiffs. (Bridges Doc. 151-2 at 186.) For their part, Defendants argue summary judgment is due to be granted on this claim because (1) Plaintiffs provide no proof that Poe and Johnson ever directly participated in the alleged sexual misconduct of Buzbee or Boyd or had actual knowledge of the misconduct, and (2) no Alabama appellate court or federal court interpreting Alabama law has recognized a claim for outrage on such facts. (Tessener Doc. 140 at 64-65; Rainer Doc. 67-69; Goodson Doc. 116 at 59-60; Dunn Doc. 117 at 59-60; Mann Doc. 109 at 66-67.)

In 1980, Alabama recognized the tort of outrage, subjecting to liability "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). To make out a claim for outrage, the plaintiff must establish "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme

and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) …

the distress was severe." *Thomas v. Williams*, 21 So. 3d 1234, 1237–38 (Ala. Civ. App.

2008) (quoting *Gunter v. Huddle*, 724 So.2d 544, 547 (Ala. Civ. App. 1998)). The

Alabama Supreme Court further explained what was necessary for the second

element requiring extreme and outrageous conduct, "By extreme we refer to

conduct so outrageous in character and so extreme in degree as to go beyond all

possible bounds of decency, and to be regarded as atrocious and utterly intolerable

in a civilized society." *Am. Rd. Serv. Co.*, 394 So. 2d at 365.

In *Little v. Robinson*, the court outlined the limited scenarios when it was

willing to impose liability for outrage: "(1) wrongful conduct in the family-burial

context; (2) barbaric methods employed to coerce an insurance settlement; and (3)

egregious sexual harassment." 72 So. 3d 1168, 1172 (Ala. 2011) (internal citations

omitted) (quoting *Potts v. Hayes*, 771 So.2d 462, 465 (Ala. 2000)). The court did note

that these were not the only factual circumstances giving rise to liability, citing a case

when a doctor exchanged drugs for sex with a minor patient. *Id.* at 1173 (citing *O'Rear*

*v. B.H.,* 69 So.3d 106 (Ala. 2011)).

The claims here could be analogized to those in *O'Rear*. A doctor exchanging

drugs for sex with a minor patient is not so different from a jailer exchanging drugs

for sex with an inmate. While the Plaintiffs in these cases are all adult women, the

jailers unquestionably held a position of authority over them, much as the doctor did with the minor patient.

A distinguishing factor, of course, is that Plaintiffs here do not allege that Poe and Johnson were the ones engaging in this behavior, only that they knew and allowed the misconduct by the jailers to continue. If Poe and Johnson knew about such conduct, their inaction might rise to the level of extreme and outrageous, "beyond all possible bounds of decency." *Am. Rd. Serv. Co.*, 394 So. 2d at 365. As already discussed above, however, Plaintiffs have not raised a genuine issue of fact as to Poe's and Johnson's knowledge of the alleged conduct of the jailers at a point when they could have acted to prevent the harm. Because Plaintiffs have failed to raise a question of fact on this element of their outrage claims, Defendants' motion for summary judgment on Count V as to Tessener, Rainer, Goodson, and Dunn is due to be GRANTED.

### 5.   Count VI: Trafficking

As an initial matter and as with Plaintiff Bridges, the remaining Plaintiffs also concede that Poe and Johnson are entitled to qualified immunity in their individual capacities for the claims asserted in Count VI under the TVPA. (Doc. 151-2 at 207.) The Defendants' motion for summary judgment as to Poe and Johnson in their individual capacities is therefore due to be GRANTED.

However, Plaintiffs contend that the City can still be held liable. The arguments and the evidence with regard to Plaintiffs' claims on this count are largely duplicative of those set forth in regard to Plaintiff Bridges, which the Court addressed in Section III.B.6 above. For the same reasons that Bridges's TVPA claim failed,[9] Defendants' motion for summary judgment is also due to be GRANTED on the remaining Plaintiffs' TVPA claims.

### 6.   Count VII: Intimidation

Plaintiffs concede that their claims in Count VII under 42 U.S.C. § 1985(2) are due to be dismissed. (Doc. 151-2 at 206.) Accordingly, Defendants' motion for summary judgment is due to be GRANTED on these claims.

### 7.   Count VIII: Negligent Failure to Prevent Conspiracy

Plaintiffs also concede that their claims in Count VIII under 42 U.S.C. § 1986 are due to be dismissed. (Doc. 151-2 at 206.) Defendants' motion for summary judgment is therefore due to be GRANTED on these claims.

---

[9] Additionally, Plaintiffs Rainer, Dunn, and Mann admit in their complaints that they were "de facto" trustees, not officially sanctioned by the Jail. (Rainer Doc. 7 at 6; Dunn Doc. 7 at 6.; Mann Doc. 1 at 40.) Even if they performed the work of trustees, they have presented no evidence to show that the City *knowingly* benefitted from their efforts because the City did not authorize their status as trustees.

### 8.   Count XI: Negligence

#### a.  Plaintiff Mann[10]

As with the state law claims asserted for outrage in Count V, Plaintiffs' Amended Consolidated Response Brief includes a concession by Plaintiff Mann that her claim for negligence is due to be dismissed. (Bridges Doc. 151-2 at 186.) Accordingly, Defendants' motion for summary judgment on Count XI for negligence as to Plaintiff Mann is due to be GRANTED.

#### b.  Plaintiffs Tessener, Rainer[11], Goodson, and Dunn

Again, even though Plaintiffs' brief includes a concession by Plaintiff Mann that this claim is due to be dismissed, it does not provide explanation or argument as to why the same is not true for Plaintiffs Tessener, Rainer, Goodson, and Dunn. (Doc. 151-2 at 186.) For their part, Defendants note that Plaintiffs do not specify whether they are suing Poe and Johnson in their individual or official capacities, but to the extent that they are sued in their official capacities, their claims are barred by the statute of nonclaim, Alabama Code § 11-47-23. As discussed with regard to Bridges's claims for negligence in Section III.B.4 above, the statute of nonclaim bars

---

[10] The Court recognizes that it has already found in Section III.C.1.c that the claims by Plaintiff Mann on this Count are barred by the statute of limitations.

[11] The Court recognizes that it has already found in Section III.C.1.c that the claims by Plaintiff Rainer on this Count are barred by the statute of limitations.

tort claims against municipalities for which are not brought within six months of the claim accruing. Ala. Code § 11-47-23. As discussed above, another route for satisfying the requirement in the statute of nonclaim is by filing a complaint or presenting the claim to the clerk as stated in the statute. *Boyle v. Pell City*, 866 F.3d 1280, 1287 (11th Cir. 2017).

As with Bridges, Defendants point to an affidavit provided by Kathy Chambliss, the City Clerk for the City of Jasper whose job responsibilities include receiving Notices of Claim for the City. In the affidavit, Chambliss states that Plaintiffs "did not file a Notice of Claim at any time with the City of Jasper." (Bridges Doc. 135-25 at 1-2.) Furthermore, Tessener filed her complaint on August 14, 2019, but she was incarcerated in the Jail until January 10 or 11, 2018 (Tessener Doc. 1; Bridges Doc. 135-3 at 242-44); Rainer and Goodson filed their complaints on August 26, 2019, but they were released on August 24, 2017, and September 28, 2017, respectively (Rainer Doc. 1; Goodson Doc. 1; Bridges Docs. 135-4 at 22 and 135-5 at 24-25); Dunn filed her complaint on September 23, 2019, but she was released on September 26, 2017 (Dunn Doc. 1; Bridges Doc. 135-7 at 131-32); and Mann filed her complaint on December 2, 2019, and she was released on November 9, 2017 (Mann Doc. 1; Bridges Doc. 135-8 at 53).

Accordingly, none of the Plaintiffs either filed their complaints or a Notice of Claim with the City within the six-month window allowed by the statute of nonclaim. Their claims against the City, therefore, are barred, and summary judgment is due to be GRANTED.

To the extent that Plaintiffs allege this claim against Poe and Johnson in their individual capacities, Defendants assert that Plaintiffs have not established that Defendants owed the non-discretionary duties that Plaintiffs allege, such as "reviewing, at least every 30 days, taped video recordings as were made of areas surveilled within the Jail" and "reviewing complaints made by female inmates or their family members about jailers." (Tessener Doc. 39 at 53-54; Rainer Doc 7 at 49; Goodson Doc 1 at 53; Dunn Doc. 7 at 48; Mann Doc. 1 at 48.) Plaintiffs, in their Amended Consolidated Response Brief, point to no authority suggesting otherwise. Nor has this Court uncovered any such authority. Because the Plaintiffs have not established that Defendants owed them this duty, Defendants' motion for summary judgment as to Count XI against Poe and Johnson in their individual capacities is due to be GRANTED.

### 9.    Standing for Injunctive Relief

For the same reasons discussed in relation to Plaintiff Bridges, the Court finds that Defendants' motion for summary judgment is due to be GRANTED as to

Johnson and Poe in the cases of the remaining Plaintiffs as well.

### D. REMAINING STATE LAW CLAIMS AGAINST DEFENDANT JOHNSON

The Court now turns to two claims that remain against Defendant Deborah Johnson. As discussed in note 3, *supra*, Bridges asserted claims for assault and battery in Count III and violation of Alabama Code § 14-11-31 in Count VI against Poe and Johnson in their individual capacities only.[12] (Doc. 59 at 18, 22.) The Court granted a motion to dismiss by Poe as to these two counts. (Doc. 89 at 25.) Johnson did not file a motion to dismiss these claims against her. The claims against Johnson remain unresolved. For the reasons set forth below, the Court finds these claims are due to be DISMISSED WITHOUT PREJUDICE.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state-law claims "if… the district court has dismissed all claims over which it has original jurisdiction." Four factors guide district courts in deciding whether to exercise supplemental jurisdiction: "judicial economy, convenience, fairness, and comity." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997).[13] "[I]f the federal claims are dismissed prior to trial,"

---

[12] Bridges's Third Amended Complaint also asserted a claim against Buzbee in his individual capacity in these two counts. (Doc. 59 at 18, 22.) As the Court has already explained, it has no jurisdiction over Defendant Buzbee and will not further address these claims.

[13] The Eleventh Circuit indicated in a recent opinion that consideration of these factors is not required once the court has dismissed all federal claims, determined that it lacked diversity

however, *"Gibbs* strongly encourages or even requires dismissal of the state claims."

*L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984)

(citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

The first and last factors of judicial economy and comity weigh against

retaining jurisdiction in this case. "Both comity and economy are served when issues

of state law are resolved by state courts." *Rowe v. City of Fort Lauderdale*, 279 F.3d

1271, 1288 (11th Cir. 2002) (citing *Baggett*, 117 F.3d at 1353)). "State courts, not

federal courts, should be the final arbiters of state law." *Baggett*, 117 F.3d at 1353

(citing *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir.1992)).

Nothing before the court indicates that the remaining factors of convenience and

fairness would weigh in favor of retaining jurisdiction. No inconvenience would arise

from Bridges pursuing these claims against Johnson in a state court closer to where

they both reside. Moreover, the Court finds no fairness issues, particularly to the

extent that the tolling provision in 28 U.S.C. § 1367(d) applies to Bridges's state law

claims. Given the instruction from *Gibbs* and *L.A. Draper & Son* along with the

Court's finding that these factors weigh against, the Court declines to exercise

supplemental jurisdiction over Bridges's claims in Counts III and VI, and these

---

jurisdiction over remaining state law claims, and concluded that § 1367(c)(3) applies. *Sutherland v. Glob. Equip. Co.*, 789 F. App'x 156, 162 (11th Cir. 2019).

claims are due to be DISMISSED WITHOUT PREJUDICE.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment (docs. 131 and 133) are due to be GRANTED. Further, the claims against Johnson for assault and battery and violation of Alabama Code § 14-11-31 are due to be DISMISSED WITHOUT PREJUDICE. Defendants' motions to strike (docs. 158 and 159) are also TERMINATED as moot. An Order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** AND **ORDERED** ON MAY 19, 2022.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
206728